Argued November 23; reversed December 14, 1948

# TRIPP and SAUNDERS v. RENHARD et al.

(200 P. (2d) 644)

D. R. *Dimick,* of Roseburg, argued the cause for appellants. On the brief were Winston & Wayman, of Roseburg.

*Edward M. Murphy* and *Gordon G. Carlson,* of Roseburg, argued the cause for respondents. On the brief were Yates & Murphy, of Roseburg.

Before Rossman, Chief Justice, and Lusk, Kelly and Hay, Justices.

ROSSMAN, C. J.

This is an appeal by the defendants from a judgment of the circuit court in favor of the plaintiffs for the purported contract price of some logs which they

sold and delivered to the defendants. The judgment is based upon a verdict.

The appellants submit the following assignments of error:

"The Court erred in admitting into evidence over appellants' objection, respondents' Exhibit A, purporting to be certain log scale sheets exhibited to appellant Renhard during negotiation for purchase of certain saw logs."

"The Court erroneously refused to permit appellants to introduce in evidence Exhibits marked 2 and 3 for purposes of identification and purporting to be checks issued in payment for saw logs to third persons on the issue of quantity of logs delivered by respondents."

"The Court erroneously instructed the jury as follows:

'The law further provides that, in the absence of an express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability and damages or other legal remedy for breach of any promise or warranty in the contract to sell; but, if, after the acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor.' "

"The Court erroneously failed to grant appellants' request Instruction No. 6, which was duly requested of the Court as follows:

'You are hereby instructed that if you find from the evidence that there are breach of warranties in the sale of saw logs in question, the buyers may accept and keep the saw logs, and are entitled to the resulting damages in reduction of the sellers action for the purchase price, without returning or

offering to return, the saw logs to the sellers and without notifying the sellers of the defects.' ''

The logs were delivered by the respondents to the appellants in purported compliance with the terms of a parol sales agreement. The respondents claimed that the logs conformed in size and grade with the terms of the agreement. The appellants denied that claim and contended that a large quantity of those delivered were undersize and of inferior grade. The evidence varied materially as to the terms of the agreement which governed size, grade and other terms.

A brief resume of some of the evidence will facilitate a consideration of the assignments of error.

The plaintiffs-respondents, A. W. Tripp and M. W. Saunders, are partners engaged in logging timberland and selling the logs derived therefrom. In February, 1947, Marcus Renhard, one of the two appellants, acting on behalf of a partnership entitled Judd Creek Lumber Company, was erecting a sawmill in the vicinity of the respondents' operations. The mill has been completed and the partnership has been succeeded by a corporation which bears the name of its predecessor. The corporation is the other appellant.

In February, 1947, Renhard and the respondents entered into a parol agreement whereby the respondents agreed to sell, and Renhard agreed to purchase, a sufficient number of logs to fill the pond of the mill he was building. Later, the respondents filled the pond. The corporation, Judd Creek Lumber Company, has succeeded to Renhard's rights and liabilities under the agreement. The facts so far mentioned are free from dispute.

The evidence received during the trial was in conflict as to (1) the terms of the agreement concerning (a)

the minimum diameter of acceptable logs, (b) the permissible relative quantities of No. 2 and No. 3 grade logs, (c) the time of payment, and (d) the person or organization which should scale the logs; (2) the total number of board feet of logs which the respondents delivered to the appellants; and (3) the relative quantity of small and large logs that were delivered. By reverting to the assignments of error, it will be observed that most of the issues of fact just mentioned are not germane to any contention before us, and, accordingly, we shall omit mention of the evidence upon those matters. Two disputed facts, however, are material: the terms of the contract which fixed the minimum diameter of the logs, and the terms concerning grade. In our brief resume of the evidence we shall confine ourselves largely to that which pertains to minimum diameter.

Renhard had seen neither the respondents' logs nor their timberland when he and they entered into the agreement upon which this action is based.

The respondents, Saunders and Tripp, swore that the agreement was for "$25 a thousand timber run and gross scale on our scale." Saunders explained that the term "timber run" meant:

> "All merchantable timber as it comes—just one cut right after the other and not selective logging —that don't mean to leave big old-growth trees nor does it mean to cut saplings—it means to take anything that is merchantable timber. * * * I think that would be considered anything down to an eight-inch top or small end of a log—it would be merchantable timber so long as it wasn't rotten nor so conky it couldn't be used."

Tripp gave similar testimony. The respondents, in recounting from the witness stand the agreement, said

nothing about the terms governing minimum diameter of logs, except so far as that term is disclosed by the purported provision just mentioned and by the item of proof which we shall now describe. Before undertaking to relate that item, we deem it necessary to mention the fact that it was Saunders who took the leading part on behalf of the respondents in negotiating the sale of logs. Immediately prior to his call upon Renhard the respondents had delivered logs to a mill operated by a concern entitled Canyon Creek Lumber Company. When Saunders was endeavoring to interest Renhard in the respondents' logs, Renhard inquired of him about their size and grade. At that juncture Saunders showed Renhard some log scale sheets covering some of the logs delivered to the Canyon Creek mill. The log scale sheets recorded the grade, length, diameter, and so forth of each log. Concurrently with the showing of the log scale sheets, Saunders told Renhard that the logs he was offering to him would be taken from the same tract that produced those described in the sheets. The latter are the subject-matter of the first assignment of error. Thus, it is seen that the respondents depend much upon the sheets to establish the terms of the contract. We shall presently return to the sheets.

■ The assignments of error do not require us to determine the terms of the sales contract and, hence, we might be justified in omitting mention of Renhard's version of the agreement. But, since error committed in ruling upon the admissibility of evidence must be prejudicial in order to warrant reversal, we shall relate Renhard's testimony briefly. He testified that when he explained to Saunders the kind of logs he wished to buy, he told Saunders that he would be unable to

pay for them unless he could procure a loan, and that the banks refused to accept logs as security if they contained more than ten per cent of No. 3 grade. The agreement which the parties effected, according to his testimony, permitted the respondents to deliver no more than ten per cent of No. 3 grade logs. He also swore that the agreement required that the logs be 16 inches in diameter or larger, although a few could be as small as 12 inches in diameter. Saunders told him, so Renhard testified, that the respondents' timber fallers had instructions to cut no trees which would produce logs smaller than 12 inches in diameter. He conceded that Saunders showed him scale sheets for logs that the respondents had delivered to the Canyon Creek mill, but testified that when he called Saunders' attention to the fact that the sheets listed logs of 13 and 14 inches in diameter, Saunders declared that the remaining trees in the tract would produce nothing less than 16 inches in diameter. The evidence indicates that the cost of manufacturing lumber out of small logs in a plant such as the appellants' is materially greater than when large logs are used. The respondents delivered to the appellants many logs, eight, nine and ten inches in diameter.

Although the above review of the evidence concerning the terms of the agreement is incomplete, it will suffice for present purposes. We shall now consider the first assignment of error. It is quoted in a preceding paragraph.

■ We have mentioned the fact that the respondents alleged that the logs they delivered conformed in size and grade to the requirements of the parol sales contract. The appellants denied those averments and insisted that many of the logs were undersize and did

not conform to grade requirements. Obviously, the burden rested upon the respondents to prove that the parties had agreed upon something in regard to size. There is evidence in the record produced by the respondents showing that the logs were to be (1) merchantable, (2) timber run, and (3) cut from the same tract which produced those that were delivered to the Canyon Creek mill. But the appellants had not seen the logs that were delivered to that mill and were unfamiliar with the respondents' timber tract. Apparently, in order to bridge that gap, the respondents resorted to testimony showing that Saunders showed Renhard some log scale sheets covering logs that had recently been produced upon the respondents' timber tract. The purpose which the respondents had in mind when they offered that evidence and the log scale sheets is disclosed by the following, which we quote from their brief:

> "Respondents' testimony was that respondent Saunders talked to Mr. Renhard, one of the appellants, concerning the purchase of logs; that Mr. Saunders had with him certain scale sheets showing deliveries made by the respondents to the Canyon Creek Lumber Company; that these sheets were shown to Mr. Renhard; and that he purchased the logs on the basis of the quality as represented in these scale sheets."

When the sheets were offered as evidence, nothing was said concerning the purpose they were intended to serve; but it will be noticed from the language just quoted that the respondents contend that the result of Saunders' submission of the sheets to Renhard, and of the latter's perusal of them, was to make them "the basis" of the sales agreement. If we understand the respondents correctly, they claim that buyer and seller

assented to the scale sheets as a provision or part of the agreement. Since the sheets contain nothing except data concerning logs, such as length, diameter, and so forth, we assume that by the phrase, "the basis of the quality" the respondents have in mind a term such as "specifications." Let us now determine what the respondents proved in regard to the sheets.

When Saunders was testifying for the respondents, his counsel handed him the log scale sheets covering the logs that were sold to the Canyon Creek mill for the purpose of introducing them as evidence.

Each day's delivery of logs to the Canyon Creek mill was followed with the preparation of a set of log scale sheets. A set consisted of two papers and was prepared by the Oregon Log Scaling Bureau, which was the concern that scaled all of the logs delivered by the respondents to the Canyon Creek mill. One of the pages was divided into columns and each of the latter was headed with one of the following words: Length, Diameter, Grade, Brand, Specie, Feet. Upon that page the Bureau entered every log that the respondents delivered to the mill on the day indicated at the top of the page. In the column entitled Grade the Bureau entered its judgment of the log's grade (No. 1, 2 or 3), and in the one that bore the term Feet it wrote its estimate of the number of board feet contained in the log. In the other columns it made the appropriate notations concerning the log's diameter, length, and so forth. The second page was a summary. For instance, the summary sheet for February 17 showed that on that day the respondents delivered to the Canyon Creek mill 83 second-growth fir logs, No. 2 grade, containing a total of 25,896 board feet; 46 second-growth fir logs, No. 3 grade, containing a total

of 11,111 board feet; and one No. 3 grade Ponderosa pine log containing 142 board feet. Glancing over the sheets one could readily discern the size, grade, and so forth of the logs.

We now turn to the testimony given by Saunders which constitutes the foundation for the ruling which received in evidence the aforementioned sheets. Upon direct examination, Mr. Saunders testified:

"Q. I show you plaintiffs' Exhibit A, marked as such for identification, which purports to be the scale sheets to the Canyon Creek pond or Canyon Creek Lumber Co. of the Oregon Log Scaling Bureau and ask you if any of those are, in fact, the sheets which you showed to Mr. Renhard as to the type, quality, and character of logs which you had been cutting from the land owned by Mr. Tripp as representative of what he would be receiving and what you would be delivering to his pond.

"A. I don't know which ones of these I showed him, but there are some of them that are in these and possibly along toward the back here—last part of February are the ones that he seen—possibly this scale sheet (indicating).

"Q. You had those with you and he looked them over, is that correct?

"A. That is right.

"Q. And looked at them with reference to the length, diameter and grade of the logs which you had been delivering to your former customer?

"A. That is right, he did.

"Q. And, what was his reaction as to what you had been delivering, what did he say?

"A. He said, 'If they run like these, they are all right,' for him.

\* \* \*

"Q. I show you, Mr. Saunders, the February 24th, 1947, scale sheet \* \* \* and ask you whether

or not you know, in fact, you showed that sheet to Mr. Renhard at the time that you had this meeting with him in the fore part of March, 1947.

"A. I don't say that I showed him this specific sheet nor will I say any other one of those.

"Q. But you do know you showed him some of these sheets in connection with the quality of logs that you were delivering to the Canyon Creek Lumber Co., is that correct?

"A. That is right.

"Mr. Yates: We ask they be admitted in evidence.

"Mr. Winston: I will have to object to them. Plaintiff doesn't recognize them as being sheets exhibited to him and the witness doesn't tell us they are. We will have to object to them on the ground there is no foundation laid for their admittance. If those are the scale sheets which were exhibited, in fact, to Mr. Renhard, he doesn't recognize them as the ones he showed to Mr. Renhard.

"The Court: I think your objection goes more to the weight of the exhibit than the admissibility. Let the objection be overruled; they may be received."

It is certain from Mr. Saunders' testimony that he did not know which scale sheets he showed to Mr. Renhard. He said:

"There are so many that look alike, I couldn't tell which I showed him or which I didn't show him."

The respondents' brief, referring to Saunders, says:

"He couldn't tell which sheets were in fact shown to Mr. Renhard."

It is impossible to determine from the record how many of the sheets were shown to Renhard; it is clear that he did not see all of them; in fact, it seems that he saw no more than two or three sets. As previously indicated, Renhard could not identify the ones he saw.

As appears from the foregoing, Saunders swore that Renhard looked at the sheets that were shown to him and indulged in comment concerning them. If we knew the particular sheets to which Renhard referred when he made his purported remark, "If they run like these, they are all right," we would know the sizes and diameters that he regarded as "all right."

The data set forth in the log scale sheets varied greatly. For instance, the logs delivered to the Canyon Creek Lumber Company on January 16 contained 50.5% No. 2 grade logs and 49.5% No. 3 grade logs. We have mentioned the scale sheets for February 17. The logs shown on those sheets contained 71% of No. 2 grade and 29% of No. 3 grade. The sheets for February 20 showed that on that day the logs delivered were 34.7% No. 2 grade and 65.3% No. 3 grade. Accordingly, if Renhard examined the log sheets for January 16 and if he then remarked, "If they run like these, they are all right," he would expect, if the sheets were "the basis" of the sale, to receive logs 50% No. 2 grade and 50% No. 3 grade. Upon the other hand, if the sheets that he saw were those of February 17 he would expect to receive 71% No. 2 grade and only 29% No. 3 grade logs. The sheets also showed that the logs varied in size from day to day. For instance, on January 16, when 51 logs were delivered, five were eight inches in diameter and seven were nine inches; many were ten and eleven inches. February 20, when 27 logs were delivered, two were 12 inches in diameter and all of the others were larger.

It is apparent that the impression one would receive of size and grade of logs coming from the respondents' timber tract would be dependent upon which sheets he saw. Very likely he would not expect that size and

grade would be uniform from day to day, but, in the absence of evidence upon that phase of timber cutting, we have no means of gauging a timber buyer's expectations.

The above will suffice as a review of that part of the evidence which is material to the first assignment of error. It is seen from the foregoing that the respondents' offer to Renhard concerned logs which they intended to get from their own timber tract. Since Renhard had not seen their tract nor any logs that came from it, he inquired of Saunders concerning size and grade. Particularly, he was interested in minimum diameter. It might have been possible to have answered his inquiry by showing him the minimum diameter logs that came from the tract, but, obviously, it was more practical to show him log scale sheets covering logs recently produced upon the respondents' timber tract.

As previously indicated, the respondents apparently deem the log scale sheets as a part of the oral offer they made to Renhard. Saunders' assurance to Renhard that the logs he was offering would come from the same tract that produced those listed upon the sheets supports the impression that they were intended by the respondents as a detail of the offer. We do not mean that each log that the respondents offered to sell would have to be a counterpart of a log listed upon the sheets, but only that the logs he offered would be no smaller than those shown on the sheets. The respondents' contention that the sheets were intended to establish "the basis" of the sale satisfies us that the sheets were regarded by the respondents during the trial as a part of the agreement which was averred in the complaint. It also seems that the respondents regarded the remark, which they attribute to Renhard, "If they run like

these, they are all right," as an assent upon his part that the sheets should govern minimum size, or, stated otherwise, they depended in part upon that alleged remark to show Renhard's acceptance of Saunders' offer.

It is true that Saunders swore that he told Renhard that the logs which the respondents offered would be "timber run" and explained that the term means that the logger will cut everything that is merchantable, including 8-inch logs, but we do not believe that the testimony repels the implication that the respondents deemed the sheets as a part of their offer governing minimum size. Whenever general terms, such as "timber run", encounter other terms that are specific, like those found in the log scale sheets, the specific normally prevails over the general. However, the assignment of error now under consideration does not require us to resolve the conflict. We are required to do nothing more than determine whether error was committed when all of the sheets were received in evidence.

■ We have sought to make it clear that when Saunders spoke to Renhard he showed him, not all of the sheets, but only some, and that he, as a witness, was unable to identify the ones he showed. Likewise, if Renhard made the remark attributed to him by Saunders, "If they run like these, they are all right," he must have been looking at a specific set of sheets. It is clear that he did not see all of them. If the sheets can be considered symbolic of the logs, a specific group of logs was shown to Renhard as samples which would govern minimum size. It seems clear that if samples instead of sheets had been shown, only the samples shown, and not others, would be deemed admissible in evidence.

Without resort to further analysis, we express the belief that the only sheets that were admissible in evidence, over the objection quoted in a preceding paragraph, were the ones that were shown to Renhard. The challenged ruling permitted the jury to rummage among the sheaf of sheets and determine by guesswork the ones Renhard had in mind when he made the purported statement just quoted. The jury had no mysterious talisman that could enable it to know which sheets Saunders placed in Renhard's hand when the agreement was made. The challenged ruling enabled the jury to take the entire sheaf of sheets to the jury room. An item of proof that the eye of the juror can see and his hand can touch is generally more persuasive than oral testimony which only the ear can hear. Oral testimony may soon be forgotten, but an exhibit in the jury room is a constant witness for the message it recites. The sheets evidently served this purpose. We sustain the first assignment of error.

■ We shall now consider the second assignment of error. It is quoted in a preceding paragraph. The ruling attacked by it was made when the appellants were endeavoring to prove the amount of logs, both in number and board feet, which were in the appellants' log pond when the respondents commenced to dump logs into it. The materiality of that fact lay in the circumstance that the appellants claimed that the quantity of logs the respondents delivered to the pond was less than the amount for which they sought payment. A log scaler in the appellants' employ had calculated the quantity of logs in the pond after the respondents had ceased their deliveries, but, of course, in order to ascertain the amount the respondents delivered it was necessary to know how many were there before their

operations began. We now quote from the record; the witness under examination was Renhard.

"Q. Approximately how many logs were in the pond, either in number or in thousands of board feet by log scale, were in the pond before they, the plaintiffs, Tripp and Saunders, started delivering logs?

"A. We had paid for 82,000 feet, I believe, as near as I can recall—82 or 83,000 feet of logs that were already dumped.

"Q. Then, subsequent to their starting deliveries, did you receive any more logs from third persons into that pond?

"A. Yes.

"Q. Do you know approximately how many were dumped in the pond?

"A. I would say there were about eight loads which make somewhere in the neighborhood of 35 to 40,000 feet.

"Q. Are you familiar with the signature of Carl E. Renhard?

"A. Yes.

"Q. Is that Carl E. Renhard's signature that appears thereon?

"A. Yes.

"Q. That is Defendant's Exhibit 2; is that your signature that appears on Defendant's Exhibit 3 for identification?

"A. Yes."

The paper which was marked for identification purposes Defendants' Exhibit 2, is a bank check in the denomination of $305.00, payable to a concern entitled Pence & Radford. It bore the signature of one Carl E. Renhard. Judging from a perforated cancellation mark, the bank paid the check. The paper marked for identification Defendants' Exhibit 3 is another check. Its payee was one Jesse Hold and, judging from appearances, its makers were the two appellants and one

Walter Urbanek. Its denomination was $305.68. A perforated cancellation mark indicates payment. We now continue our quotation:

"Mr. Winston: I would like to offer these two exhibits into evidence as Defendants' Exhibits 2 and 3.

"Mr. Yates: Objected to as incompetent, irrelevant and immaterial.

"The Court: I don't know what they are so I can't very well pass on them until I look them over.

"Mr. Winston: I will further qualify them.

"The Court: (examining documents) You will have to connect them up further before you can offer them.

"Q. Mr. Renhard, on Defendants' Exhibit 2 marked for purposes of identification, which purports to be a check—or what does that purport to be, I should ask?

"A. It is a check that is written in payment of logs to another logging company known as Pence and Radford. This check was written by the Judd Creek Lumber Co. and signed by myself and one of my partners because our bank account had been attached and this was made out to take the place of the other check that had been written to pay a logger for logs delivered.

"Q. Delivered to the pond in question here?

"A. Yes.

"Q. I will hand you Defendants' Exhibit 3 for identification and ask you what that purports to be?

"A. This is a check written to Jesse Hold who was another independent logger and who also owed us some logs on another obligation and this is payment for additional logs, the check for $305.68, final payment on logs delivered to our pond.

"Mr. Winston: I again offer these two exhibits.

"The Court: I don't understand the purpose.

"Mr. Winston: Trying to establish the number of logs that were in this mill pond prior to the time Mr. Lawrence scaled the pond.

"Mr. Yates: We submit to the Court that that is immaterial.

"The Court: You object to the checks on that ground?

"Mr. Yates: Yes.

"The Court: Let the objection be sustained."

In an endeavor to show that the two checks were erroneously excluded, the appellants' brief says:

"It would only take simple arithmetic to determine the number of logs paid for to other parties at so many dollars per thousand board feet, which is the customary way of selling saw logs. The Court by its ruling took away from appellants a very good method of proving by documents the true number and quantity of saw logs delivered to appellants by respondents."

By reverting to the excerpt of testimony just quoted, it will be observed that it does not indicate the number of logs the payees of the checks dumped into the appellants' pond, nor does it mention the price in terms of board feet that they charged for the logs. Under the circumstances, the two excluded checks merely proved that those loggers were paid for their logs. That fact was immaterial to the issues of this case. The observation just made suffices to sustain the questioned ruling, which, it will be observed, was based solely upon an objection of immateriality. Later, the appellants presented evidence from which it was possible by the use of the checks to determine the quantity of logs that were delivered by Charles Renhard and Pence & Radford, but the checks were not then re-offered. This assignment of error is without merit.

We shall consider the remaining two assignments of error together; both are quoted in a preceding paragraph. By returning to them it will be noticed that assignment of error No. 3 is based upon an instruction which was given to the jury and that the fourth is based upon a requested instruction which was refused. Both are concerned with the question as to whether or not a buyer must give timely notice of a purported breach of warranty in order to plead recoupment in an action brought to recover the price of the goods.

■ In a period of about two months the respondents delivered to the appellants the logs for which they seek payment; there were 105 loads of them. The alleged breach of warranty, mentioned in the two assignments of error, consisted of delivery of logs which according to the appellants, were undersize. The appellants' log pond was adjacent to their mill and office structure. If the logs were undersize, that fact was readily discernible. The appellant, Judd Creek Lumber Company, has manufactured the logs into lumber. The evidence was capable of warranting a finding that the appellants failed to give timely notice to the respondents of their claim of breach of warranty.

The appellants' brief argues:

"No notice is required as to the breach of warranties complained of by the buyer where the buyer elects to defend an action against him for the purchase price, by pleading damages for breach of warranty by way of recoupment in diminution or extinction for the purchase price."

The brief says, however:

"Had the appellants elected to proceed in their defense by way of counterclaim in which they could have recovered a sum of money from respondents

in excess of the amounts claimed due by the respondents in their complaint, the instructions complained of would have been proper under the circumstances."

In other words, the appellants argue that a buyer who failed to give timely notice of breach of warranty will fail if he pleads a counterclaim, but will succeed if he pleads in recoupment. The issue presented by these two assignments of error is whether or not the Uniform Sales Act (§§ 71-101—71-180, O. C. L. A.,) supports the appellants. Their concession in regard to counterclaim was certainly warranted: *Maxwell Co. v. Southern Oregon Gas Corp.*, 158 Or. 168, 74 P. 2d 594, 75 P. 2d 9, 114 A. L. R. 697.

Section 49 of the Uniform Sales Act, which, as adopted in this state, is § 71-149, O. C. L. A., says:

"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor."

It will be noticed that the provision exacts of a buyer, who is not favored by a stipulation to the contrary, a duty which he must perform if he wishes to hold the seller liable for a breach of warranty. The duty is the following: "give notice to the seller of the breach of any promise or warranty." The provision states clearly the time when the duty must be performed. The time schedule is: (1) "after acceptance," and (2) "within a reasonable time after the buyer knows, or ought to

know, of such breach." By reverting again to the provision, it will be observed that its sweeping language is all inclusive. It is not applicable only in some forms of action, nor is it confined only to some defenses. In fact, it is not concerned with procedure. The object of its concern is something more fundamental than procedure. Procedure is subservient to or the handmaiden of rights. Section 49 is concerned with the recognition and extinction of rights. The provision recognizes no exceptions to the rights with which it deals and the duties which it exacts save only those wherein the parties "by express or implied agreement" have provided for a different course. It states in simple language the result which the courts must recognize when the buyer fails to give the needed notice. The result, as stated, is: "the seller shall not be liable therefor."

Williston on Sales, in language which has been frequently quoted, points out clearly the respective rights of seller and buyer which § 49 preserves. The treatise's most recent exposition of that provision is § 484a of the Revised Edition; we select from the section the following:

" * * * A rule seems desirable which is capable of some certainty in its application and also on the one hand avoids the hardship on the buyer of holding that acceptance of delivery and the property in the goods necessarily deprives him of the seller's obligations, and on the other hand avoids the hardship on the seller of allowing a buyer at any time within the period of the Statute of Limitations to assert that the goods were defective, though no objection was made when they were received. With this in mind the positive requirement of prompt notice was inserted in the statute. Such notice or protest, apart from statute, has been regarded in

some jurisdictions as important evidence bearing on assent to receive defective goods in full satisfaction, but the statute makes it an absolute condition. In view of the extensive enactment of the Sales Act and the reasonableness of the rule the Restatement of Contracts states it as the law. Subject to this requirement, the buyer's right against the seller is not destroyed by acceptance of possession and the property in the goods.''

It will be noticed that the purpose which § 49 seeks to serve is as applicable to recoupment as to counterclaim. The purpose is to substitute a shorter time than the limitation period for the presentation of claims based upon breach of warranty.

■ Section 49 (§ 71-149, O. C. L. A.), as we have pointed out, does not prescribe the rules of procedure. It deals with substantive rights. Section 69 (§ 71-169, O. C. L. A.) is the part of the act which prescribes procedure. Procedure, of course, does not create substantive rights. It is the judicial machinery through which parties enforce rights. The pertinent part of § 69 is the following:

''(1) Where there is a breach of warranty by the seller, the buyer may, at his election: (a) Accept or keep the goods and set up against the seller the breach of warranty by way of recoupment in diminution or extinction of the price; * * *

''(2) When the buyer has claimed and been granted a remedy in any one of these ways, no other remedy can thereafter be granted.

''(3)     *     *     *.''

From Williston on Sales, Rev. Ed., § 605, we quote:

''The theory of recoupment is that the plaintiffs' damages are cut down to an amount which will compensate him for the value of what he has given. In many cases this remedy is equivalent in its results

to that of a defendant under statutes of counterclaim to have any damages to which he is entitled deducted from the sum for which he is liable to the plaintiff, but the theories by which the amount is reached under the doctrine of recoupment and under the doctrine of counterclaim are different. Under the doctrine of recoupment the theory is that the defendant is not bound to perform the contract on his part, but he has received something of value for which he ought to pay. Under the statutes of counterclaim the defendant does not seek to enforce the plaintiff's obligation and to deduct his liability for breach of that obligation from the amount due from himself."

The nature of recoupment and of .counterclaim, being as just described, it would be remarkable if the courts had adopted the views suggested by the appellants and applied § 49 in counterclaim but not in recoupment. We searched diligently through the authorities but found none which even considered the construction proposed by the appellants. We encountered four which held that the notice provision of § 49 is applicable to recoupment, and we shall now briefly review them.

In *Simonz v. Brockman,* 249 Wis. 50, 23 N. 2d, 464, it appeared that the plaintiff was the manufacturer of soda fountain equipment, and that the defendant was the owner of a store which had a soda fountain. The defendant purchased from the plaintiff soda fountain equipment at the price of $954.00, and paid on account $600.00. The action under review was for the balance, $354.00. The answer alleged breach of warranty. The trial judge's opinion, as set forth in the decision under review, said:

"* * * it was necessary to install a new compressor of ½ H. P. and that the pipes and other mechanism were not properly connected and

that he then proceeded to install a new compressor and correct the faulty installation so that said soda fountain would perform its duty; that the expense for so doing was $469.78, which amount the defendant is entitled to recover as a recoupment; that the defendant failed to prove his counterclaim and the same is dismissed; that the recoupment more than offsets the balance due the plaintiff on his counterclaim, so that the complaint is dismissed with costs."

The opinion of the Supreme Court held:

"The trial court decided the case upon the theory that the evidence, which was received without objection, supports the view that under the circumstances an implied warranty existed that, (1) the equipment of a soda fountain to be installed by the plaintiff would operate the fountain properly and freeze ice cream and keep it frozen; (2) that the plaintiff breached this warranty; and (3) that the defendant could recoup the damages sustained by reason of the breach and offset it against the purchase price of the property sold. But while by reason of the breach and offset it against the premises (1) and (2) are correct conclusion (3) is incorrect, for the defendant was not entitled to recoup his damages because there is no finding that the defendant served on the plaintiff the notice required by sec. 121.49, Stats., and that he claimed damages for the breach, nor is there any evidence of the giving of such notice."

It is seen therefrom that the exact contention urged upon us by the appellants was rejected. The recoupment was disallowed because the buyer had failed to give the notice demanded by § 49 of the Uniform Act.

From *Canada Maple Exchange, Ltd. v. Scudder Syrup Co.*, 223 Ill. App. 165, we quote:

"* * * This section provides that if the purchaser of goods finds that they are not according

to the contract, he must, within a reasonable time, notify the seller of this fact, and, if this is not done, the purchaser loses any claim he may have against the seller. There is no evidence in the record, nor was any offer made, tending to show that defendant notified the plaintiff that the sugar was not in accordance with the terms of the contract. So far as it appears from the record, the first the plaintiff knew of this was when the set-off was filed, which was July 27, 1918, more than a year after the sugar was received. For the failure of the defendant to notify the plaintiff within a reasonable time that the sugar was not in accordance with the contract requirements, the defendant lost any claim it had under section 49 above quoted."

In *Berman v. Littauer,* 141 Md. 649, 119 Atl. 565, the court said:

"* * * Not only are the prayers thus in conflict, but there is nothing in the defendants' prayers to supply the omission from the plaintiffs' prayer of any reference to the defendants' right to recoup if they notified the plaintiffs of the breach of warranty and if the material was of inferior quality. We may in speaking of these prayers adopt a phrase used by Chief Judge Boyd in W. B. & A. R. Co. v. State, 136 Md. 115, 111 Atl. 168, that—

'The jury could not, without disregarding one or the other, come to any correct conclusion.'"

*Trimount Lumber Co. v. Murdough,* 229 Mass. 254, 118 N. E. 280, was an action to recover the contract price of some "long leaf merchantable hard pine" which the plaintiff's predecessor had delivered to the defendant. We now quote from the court's statement of the facts:

"It was contended by the defendant who had pleaded in recoupment, that as the material was not of the 'size and character called for' he was

entitled to damages. But the exceptions unequivocally recite 'that all the lumber delivered by the plaintiff was accepted by the defendant,' and from the entire record which includes the pleadings, it appears, that while the last delivery was March 23, 1910, no claim for damages for nonfulfillment 'down to April 1, 1911, was given * * * other than a notification twice repeated that if the 3 x 4 material needed for the first floor was not delivered promptly the defendant would buy it in the Boston market'."

The court further said:

"The presiding judge in instructing the jury said that if the defendant claimed to have been damaged through delay in delivery or lack of quantity or quality of which he knew or ought to have known, and failed within a reasonable time after acceptance to notify the seller that he claimed damages although particular defects need not be specified, he could not recover even if he had suffered damages from the breach, and left to the jury the question whether under all the circumstances such notice had been given."

The court held:

"The law having been accurately stated, and the interpretation of the contract being unexceptionable, the defendant although he excepted to the instructions has no grounds of complaint. A notice that if the material needed for the first floor was not delivered promptly the defendant would buy it elsewhere is not notice of a breach of the contract for which damages would be claimed. The verdict for the plaintiff for the full amount with interest being conclusive of the defendant's failure to show compliance with the statutory condition, his exceptions to the exclusion of evidence which he contends was admissible on the question of damages have become immaterial, and need not be determined."

The attacked judgment was affirmed.

We could add to the foregoing decisions a half score more in which the court in mentioning recoupment spoke of the requirement of notice.

The appellants cite 46 Am. Jur., Sales, § 724, page 848. The part of that section which is applicable to the issue before us is supported only by decisions which were rendered before the Uniform Sales Act was written. That act changed substantially the common law: Williston on Sales, Rev. Ed., § 484a.

■ We believe that the decisions from which we quoted placed the correct construction upon the applicable provisions of the Uniform Sales Act. No only does that fact commend those decisions to us, but in addition Uniform acts should be uniformly interpreted. Nothing can be gained through uniformity of legislation unless the courts give the Uniform acts uniform interpretation.

We reject assignments of error 3 and 4. We sustain assignment of error 1.

Reversed.