Argued December 6, 1961, reversed March 28, 1962

WESTERN FEED COMPANY *v.* HEIDLOFF
370 P. 2d 612

*James H. Clarke,* Portland, argued the cause for appellant. With him on the brief were Koerner, Young, McColloch & Dezendorf and Herbert H. Anderson, Portland.

No appearance for respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, a livestock feed merchant, from the judgment entered in an action which it brought against the defendant, a farmer, to recover the "agreed and reasonable" value of pig feed and other farm supplies delivered by the plaintiff to the defendant between February 9, 1959, and July 11, 1959. The complaint alleged that the goods had a value of $2,220.16 of which $709.69 had been paid. The prayer was for $1,510.47 and interest.

The answer was a general denial followed by a "further answer and counterclaim." The latter alleged that the defendant was a farmer who devoted a part of his operation to raising pigs for sale. It stated that the farm was visited by the plaintiff on or about January 2, 1959, and that the plaintiff then made an extensive investigation, after which the parties entered into a contract. By the terms of the latter the plaintiff agreed to supply "all necessary feed, advice on feeding, guidance on production and general advice as to the latest methods and practices of hog raising" and the defendant agreed to purchase from the plaintiff the feed prescribed by it. Continuing, the defendant averred the agreed contract price per ton of various kinds of feed, listed several items which he found to be satisfactory and paid for, and arrived at an unpaid balance of $1,596.35. The defendant alleged that he was induced to enter into the agreement in reliance upon "representations and warranties" that the feed would be "of good quality, nutritious and palatable," and that it was "designed to produce one pound of

growth for each three pounds of feed after the pigs were weaned." The defendant alleged that he informed the plaintiff that "he would have approximately 100 head of pigs to raise from birth." He charged a breach of all the alleged warranties and averred that by reason of them "the pigs became ill and * * * did not gain one pound for each three pounds of feed consumed" with resulting damages of $2,591.44 from which the defendant subtracted the "agreed contract price of $1,596.35" to arrive at $995.00 for which he demanded judgment. The reply denied the averments of the counterclaim except as alleged in the complaint.

The case was tried by a jury and judgment was entered upon its verdict denying affirmative relief to either party.

The plaintiff first assigns as error the trial judge's denial of its motion for a directed verdict; the motion was as follows:

> "Plaintiff moves for a directed verdict against the defendant for the sum of $1,510.47 prayed for in this complaint, based upon his admission that said sum is due and owing."

The motion was presented with a second one for a directed verdict against the defendant on his counterclaim. The trial judge appears to have considered the two motions as a single motion, and denied them as one. However, in instructing the jury he did, in fact, direct a verdict in favor of the plaintiff for at least the amount sought as damages by the complaint. After instructing the jurors that they must choose between the defendant's counterclaim, which alleged an express contract price of $1,596.35 for feed, and the plaintiff's complaint, which alleged an unpaid balance of $1,510.47, the judge instructed the jury:

> "So in this case, there would be a sum due and

owing of at least—for the lesser amount at least, of $1,510.47, unless you find that there has been a breach of warranty and that the defendant is entitled to either a setoff or a judgment in excess of the amount of the price of the feed."

In connection with this assignment of error the plaintiff urges that the jury, by its verdict, decided against the defendant on the counterclaim and hence, necessarily, against the plaintiff on his claim. The court instructed the jury on a form of verdict in the following manner:

"I have prepared two forms of verdict. If you find the plaintiff is entitled to recover, Western Feed, your verdict will read as follows: 'We, the jury, being duly impaneled and sworn to try the above-named action, do find a verdict in favor of the plaintiff in the sum' of blank dollars which you would have signed by your foreman and returned back into court.

"If you find the defendant is entitled to a verdict, it would read: 'We, the jury, being duly impaneled and sworn to try the above named action, do find our verdict for the defendant on his counterclaim in the sum of' blank dollars * * *."

At this point the court asked counsel if they noticed any part of the charge that required correction or anything that was "left out." After a brief conference the court further instructed the jury:

"Ladies and gentlemen, if you found that neither party was entitled to recover in the case, then the verdict would be a general verdict without damages to the defendant."

The jury returned the following verdict:

"We, the jury, being duly impaneled and sworn to try the above named action, do find our verdict in favor of the defendant."

If the jury instructions regarding the form of verdict are read without reference to the other instructions, the plaintiff's contention that the verdict denied both parties a recovery upon their respective claims would have greater force. However, since the court instructed the jury that it must allow damages to the plaintiff unless such damages were set off or exceeded by the defendant's damages, the verdict can only be construed as setting off the claims of the parties in equal amounts.

■ Under the instructions the jury was required to find that the plaintiff's minimum damages were $1,510.47. We must presume that it assessed his damages in at least that amount. This, however, was the amount demanded by the complaint and by the motion for a directed verdict. The first assignment of error is without merit.

The plaintiff next assigns as error the trial court's denial of its motion for a directed verdict in its favor and against the defendant on the counterclaim. The motion is as follows:

"The plaintiff further moves for a directed verdict against the defendant on the defendant's counterclaim for the reason and upon the ground that there is no satisfactory evidence that the plaintiff agreed to supply feed which would produce one pound of growth for three pounds of feed; and for the further reason that there is no satisfactory evidence that the plaintiff failed to supply defendant with feed that was of good quality and palatable and designed to produce one pound of growth for each three pounds of feed after the pigs were weaned; and for the further reason that there is no satisfactory evidence of any damage for any breach of warranty, or for breach of contract. There is no evidence in this case of any valuation of any property if it had been as warranted or of

any valuation of any property as it actually existed. * * *"

On this appeal the plaintiff has abandoned the first ground of its motion—that there was no evidence "the plaintiff agreed to supply feed which would produce one pound of growth for three pounds of feed"— but contends that the motion should have been granted upon the remaining grounds.

The plaintiff views the counterclaim as an action for breach of express warranties and we think this is correct. The defendant alleged in his counterclaim that he was induced to contract with the plaintiff for the purchase of feed "by reason of his reliance upon the following representations and *warranties:* That the feed would be of good quality, nutritious and palatable; and that it was designed to produce one pound of growth for each three pounds of feed after the pigs were weaned." (Italics supplied) The italicized word originally was "promises," but was amended on the day of the trial at the suggestion of the trial judge. We think it is clear, therefore, that the counterclaim relies upon express representations and express warranties, and makes no claim for breach of implied warranties. Uniform Sales Act, ORS 75.140 and 75.150.

The defendant failed to prove that the feed in question was not "designed to produce one pound of growth for each three pounds of feed." He testified that the plaintiff told him "it would take three pounds of their feed to make a pound of gain," but proof that merchandise does not in a single instance produce a desired result is not evidence that it was not designed to do so.

■ A more difficult question is presented by the plaintiff's assertion that there was no satisfactory evi-

dence to prove the feed was not "of good quality and palatable." On this appeal the plaintiff also questions the sufficiency of the proof that an express warranty of palatability was made, but inasmuch as the motion for a directed verdict did not raise the issue it cannot be considered here. *Woods v. Dixon,* 193 Or 681, 240 P2d 520 (1952); *Edvalson v. Swick,* 190 Or 473, 227 P2d 183 (1951); *Bergholtz v. Oregon City,* 116 Or 18, 240 P 225 (1925).

Evidence was received tending to show that the defendant began fattening his pigs on the plaintiff's feed early in March, 1959. The date is variously given as March 4 or March 9. According to the testimony of the defendant and others, the pigs commenced to "fight the feed," they rooted it out of the feed trough and refused to eat it. A few days after the pigs were placed on the feed they developed scours, which further retarded growth. The defendant testified that the feed was the cause of the scours, and that the condition cleared up when he changed from the plaintiff's feed to another brand. June 29, 1959, a pig selected at random from the feeding pen was delivered to Dr. Dean Smith, a clinical pathologist associated with Oregon State College. The animal was slaughtered and a necropsy performed with the result that Dr. Smith was unable to detect any lesions or other traces of communicable disease. He was able to ascertain that the pig had not eaten "recently."

There was no direct testimony other than that of the defendant that the feed was the cause of scours in his pigs. The plaintiff contends that the record contains no evidence whatever upon this point—apparently upon the theory that only expert medical testimony is competent to establish a causal relationship. However, in view of the fact that the care of livestock

is generally in the hands of laymen, courts will usually accept opinion evidence concerning the physical condition of animals from lay individuals who can testify to their practical experience in animal husbandry. It is generally held that an experienced layman who has observed sickness in livestock following consumption of a particular feed or other substance may testify that the feed was its cause. The authorities are collected and discussed in an annotation, "Admissibility of opinion evidence of lay witnesses as to diseases and physical condition of animals," 49 ALR 2d 932, 973. We believe that the defendant's testimony, at least when supplemented by that of Dr. Smith, was sufficient to establish a prima facie case that the feed, rather than some other agent, was responsible for the condition of the defendant's pigs. Moreover, the testimony of Dr. Smith, when added to the other evidence which indicated that the pigs were reluctant to eat the feed, was adequate to establish breach of warranties of quality and palatability.

■■ The remaining ground of the motion for a directed verdict is that the defendant failed to produce "satisfactory evidence of any damage for any breach of warranty." Since the defendant proved a breach of warranty, the jury could have found that he was entitled to at least nominal damages and the motion was therefore properly overruled. Cf. *Sunny Side Land & Imp. Co. v. Willamette Bridge Ry. Co.,* 20 Or 544, 26 P 835 (1891); *Nicholson v. Jones,* 194 Or 406, 242 P2d 582 (1952).

We would reach the conclusion just expressed without taking nominal damages into consideration. The defendant presented proof of three items of damage. First, he testified that he paid $1,991.90 for extra feed to finish fattening the pigs after he discontinued the

plaintiff's feed. Second, he testified that he lost profits of $319.38 because the pigs were not ready for market at the customary time. Third, he testified that he incurred additional daily labor costs of $2.50 each day between June 8, 1959, and September 21, 1959. If any one of these items of damage was correctly received, the motion for a directed verdict was properly overruled and nothing is preserved for review on appeal.

We turn first to the evidence of the replacement value of the feed. The defendant's pigs were farrowed over a three week period. One group was put on feed March 4, 1959, another group on March 11, 1959, and a third group at some later time. The defendant testified that he was generally able to market all of his pigs eighty days after placing the first of them on feed. The eighty day figure was an average based upon experience. Nine hogs were marketed on June 8, 1959, at which time the defendant was still using the plaintiff's feed. In fact, the defendant did not discontinue this feed until a time variously identified by the defendant as June 24, 1959, and July 8, 1959. After June 8, 1959, he continued to fatten his remaining pigs, first on the plaintiff's feed and later on another brand, marketing them in small groups as they arrived at a desired weight. The last were sold on September 21, 1959.

■ This court has several times held that the measure of general damages for breach of warranty where the buyer retains the goods is the difference between the value of the goods as warranted and the value of the goods actually supplied. *Sol-O-Lite Laminating Corp. v. Allen*, 223 Or 80, 353 P2d 843 (1960); *Boone v. Lockhart*, 143 Or 299, 22 P2d 317 (1933); *Wells v. Oldsmobile Co.*, 147 Or 687, 35 P2d 232 (1934). In

none of these cases was livestock involved. While the plaintiff appears to believe that the proper measure of damages in a case of this character is the difference in the value of the pigs if the feed had been as warranted and their value after consuming the feed actually supplied, we think that to make general damages dependent upon the use to which the warranted goods are put would produce unnecessary uncertainty.

In *Parrish v. Kotthoff*, 128 Or 529, 274 P 1108 (1929), an action for breach of warranty, a dealer furnished ordinary rye seed instead of the Rosen rye seed which had been ordered to a sheep grower who, as the dealer was aware, intended to use the crop for pasturage. This court held that the proper measure of damages was the difference in value between the crop which the plaintiff raised, and a crop of Rosen rye. Although the plaintiff sought damages for the "loss resulting to plaintiff's sheep from not having sufficient and proper pasturage for feeding and fattening them," the court apparently did not regard such a loss as compensable under the circumstances. In *Kotthoff v. Portland Seed Co.*, 137 Or 152, 300 P 1029 (1931), a subsequent decision involving the same seeds, we held that "the testimony in the case shows the value reasonably expected from the crop had the seed been Rosen rye and the value thereof for pasturing sheep, the number of head that could be pastured, and the value of the seed if they had raised a crop of seed, which formed a complete basis for the jury to estimate the damages caused by the seed not being Rosen rye * * *."

In *Sol-O-Lite Laminating Corp. v. Allen*, supra, we expressly held that the replacement price of goods which failed to conform to warranty was not "compensable damage" and that proof of the replacement

value was "beside the point and irrelevant." In that case the warrantee purchased defective goods in closed containers for resale, and alleged as damages the cost of replacing the merchandise for dissatisfied customers. While denying recovery of such damages, we allowed special damages for the loss of good will occasioned by the defective goods.

Where a livestock grower purchases a quantity of feed which ordinarily would be sufficient to bring his animals to the weight at which he generally markets them were it not for some defect in the feed which retards their growth rate, we believe that general damages for the breach of warranty may be proved by showing the actual cost, if reasonable, of buying additional feed to complete the fattening process. The price of the additional feed will approximate the actual difference in value between the feed as warranted and the feed supplied. It is at least as reliable a basis for assessing damages as expert opinion. We do not believe that *Parrish v. Kotthoff,* supra, or *Kotthoff v. Portland Seed Co.,* supra, take a contrary view, and because of the factual distinctions between this case and *Sol-O-Lite Laminating Corp. v. Allen,* supra, we are not required to express any opinion regarding what was there said.

As we have previously noted, the defendant testified that he paid $1,991.90 for the extra needed feed. The proprietor of the West Union Feed and Hardware Company, which supplied the additional feed, testified that the defendant purchased "near two thousand dollars worth." Neither testified that this was the reasonable value of the feed. Although it was stated in *Sol-O-Lite Laminating Corp. v. Allen,* supra, that the price paid for goods is "not necessarily their value," we believe that the retail price of new and un-

used goods is prima facie what they are worth, and that evidence of the price is enough to take the case to the jury. See McCormick, Damages, § 46, p. 175 at 176, 177.

■ The plaintiff also insists that the defendant cannot recover because he failed to minimize his damages. Without pausing to consider whether the asserted grounds of the motion were specific enough to advise the trial court of what the plaintiff complained in this respect, we need only observe that the defendant was not required to minimize his general damages. He had a right, under the Uniform Sales Act, to retain the goods and maintain an action for the breach of warranty. ORS 75.690. Such cases as *American Oil Pump & Tank Co. v. Foust,* 128 Or 263, 274 P 322 (1929), and *Swift & Co. v. Redhead,* 147 Ia 94, 122 NW 140 (1909), cited by the plaintiff to support his view, are not in point, since they deal with the recovery of special damages.

The motion for a directed verdict was therefore properly denied. However, since the decision of the lower court must be reversed on other grounds, we will consider the other items of damage which the defendant attempted to prove.

■ The defendant testified that he lost profits because his pigs were not ready for market at the usual time. He testified that he had informed the plaintiff of the length of time he needed to market pigs before the parties entered into the alleged agreement for the purchase of feed. Although the plaintiff argues that this element of damages was not within the contemplation of the parties, there was sufficient evidence to show that it was. Moreover, it is clear from ORS 75.690 (6) and from our decisions that lost profits may be recovered in an action for breach of warranty

if they can be established with sufficient certainty. *American Oil Pump & Tank Co. v. Foust,* supra, 128 Or 263, 274 P 322 (1929); cf. *Cluck v. Fish,* 330 Or 63, 368 P2d 626 (1962). The certainty that is required is certainty that a loss of profit resulted from the breach. *Feeney & Bremer v. Stone,* 89 Or 360, 171 P 569, 174 P 152 (1918). Once it is established that loss occurred, considerable latitude will be permitted in proving the amount, provided that the evidence is the most satisfactory available under the circumstances. See McCormick, Damages, p. 110; 3 Williston, Sales (Rev. Ed.) § 599k; 15 Am Jur 791, Damages, § 353; 25 CJS 803, 810, Damages, §§ 155, 158.

Here the defendant testified to the price per pound received at market for the pigs which he was able to sell on June 8, 1959, (at which time they had been on feed either 92 or 97 days) and to the lesser price which he received for the pigs marketed later. He calculated his damages as the difference between these amounts. No one testified that the stunted pigs could have been marketed at an earlier time.

We think that this was proper evidence of the amount of loss sustained. However, the testimony was insufficient to sustain a recovery for the reason that there was no evidence to show that the market price for pigs tends to decline as the season progresses. In the absence of such evidence it appears equally likely to one unfamiliar with market practices that the price fluctuates in an unforeseeable manner for which the warrantor cannot be held liable.

With regard to loss of profits the argument that the defendant failed to minimize his damages also has force. The warrantee is entitled to accept defective goods and set off the difference in value against the

purchase price, but his use of goods known to be defective may foreclose recovery of consequential damages. The requirement of minimizing damages may "include the duty to replace the defective article with an efficient one." *American Oil Pump & Tank Co. v. Foust,* supra, 128 Or 263, 274 P 322 (1929).

The pigs developed scours early in March and refused to eat the plaintiff's feed. These facts were known to the defendant and he complained to the plaintiff. It was the plaintiff's position at that time and since that the pigs were diseased and that the feed was of good quality. On April 29, 1959, a veterinarian inspected the pigs at the defendant's request. He prescribed terramycin for possible disease and a mineral supplement for possible mineral deficiency. Finally, on June 29, 1959, the defendant brought a pig to Dr. Smith for autopsy with results that strongly indicated the feed was in some way deficient.

■ It seems clear from the evidence that the defendant entertained strong suspicions about the quality of the feed long before June 29, 1959. While he was not required to stop using the feed on the basis of his suspicions, he should have acted to determine whether they were justified. On the record before this court he was dilatory in not doing so, and no recovery for lost profits could be allowed unless traceable to a brief period following the time the pigs were first placed on feed.

■ In view of the possibility of another trial, we note that the burden of proving failure to minimize damages rests upon the party who is guilty of the breach of contract. *Enco., Inc. v. F. C. Russell Co.,* 210 Or 324, 311 P2d 737 (1957).

■ Finally, the defendant demanded damages for his increased labor costs. He testified that he was re-

quired to work approximately two and one-half hours per day to keep the feeding pens clean at a time when the pigs should already have been marketed, and estimated the reasonable value of his services as one dollar per hour. The defendant did not prove any out of pocket loss, but in effect asked to be compensated for his inconvenience. What we have said with respect to minimizing loss of profits applies with equal force to increased labor costs. In addition, we think a line must be drawn to preclude recovery of these damages. We hold that a warrantee is not entitled to compensation for work and labor of his own made necessary by a breach of warranty, where no loss in money is shown.

The third assignment of error charges that the trial court erred in overruling a demurrer to the counterclaim and in denying a motion for a judgment of involuntary nonsuit against the counterclaim. Both the demurrer and the motion are urged here upon the grounds that the defendant failed to plead or prove that he gave notice of a breach of warranty as required by the Uniform Sales Act. ORS 75.490 provides:

"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

The demurrer was presented orally on the day of the trial before a jury was impanelled. It was based

upon the ground "that the amended answer fails to state facts sufficient to constitute an affirmative defense or counterclaim." The reasons were further elaborated by argument of counsel in support of his demurrer, but the argument is not a part of the record.

Apparently there is no decision of this court in which the sufficiency of the pleading of a notice of breach of warranty was tested by demurrer. Since seasonable notice is made by the statute a condition precedent to a right of recovery for breach of warranty, it has been held that notice must be pleaded and proved, *Israel v. Miller,* 214 Or 368, 328 P2d 749 (1958); *W. S. Maxwell Co. v. Southern Oregon Gas Corporation,* 158 Or 168, 74 P2d 594, 75 P2d 9, 114 ALR 697 (1937); *Tripp v. Renhard,* 184 Or 622, 200 P2d 644 (1948).

■ The only allegation of notice in the defendant's "Further Answer and Counterclaim" appears in Paragraph V, where it is stated that "the defendant notified plaintiff of the deficiency in said feed * * *." The plaintiff did not demur or move against the further answer and counterclaim within the time specified by ORS 16.040, but instead filed a reply containing a general denial. It will be observed that Paragraph V alleges that notice was given to the plaintiff. We need not determine whether the allegation would have withstood a demurrer interposed within the time provided for filing a reply or at some reasonable time before the trial of the case. As stated by Chief Justice ROBERT BEAN in *Bade v. Hibberd,* 50 Or 501, 93 P 364 (1908), if an objection to the sufficiency of a pleading is "made for the first time on the trial, the same presumption will be indulged in to support the pleading, as if the objection had been made after verdict." To the same effect are *Cooper v. Hillsboro*

*Garden Tracts,* 78 Or 74, 152 P 488, Ann Cas 1917E 840 (1915); *Mills v. Liquidators,* 206 Or 212, 288 P2d 1060 (1955). Assuming that those cases involve objections to the introduction of evidence presented after the impanelling of the jury and commencement of trial, we think the rule applies with equal force to the present case in which the plaintiff delayed making his objection until the day when the trial was scheduled to begin.

■ The general rule as to the sufficiency of a complaint after verdict was set forth in *Nicolai v. Krimble,* 29 Or 76, 43 P 865 (1896):

"* * * whenever facts which are so essential to a recovery that, without proof of them on the trial, a verdict could not have been rendered under the direction of the court, there the want of the express statement is cured by the verdict, provided the complaint contains terms sufficiently general to comprehend the facts in fair and reasonable intendment."

See also, *Mills v. Liquidators,* supra, 206 Or 212, 288 P2d 1060 (1955).

■ Judged by this test we think the amended answer sufficiently pleaded notice of breach of warranty. The demurrer was, so far as urged upon that ground, properly overruled. Moreover, the plaintiff's failure to have specified the grounds of his demurrer is a further reason for affirming the ruling of the trial court so long as the amended answer can be construed to state, although imperfectly, a cause of action.

■■ The motion for an order of involuntary nonsuit, which was presented after the defendant rested his case upon the counterclaim, was also properly denied. The governing statute, ORS 18.230, permits a

"defendant" to move for an order of involuntary nonsuit if the plaintiff's evidence is insufficient. ORS 18.230 does not, however, provide for judgments of involuntary nonsuit against counterclaims. At common law there was no such remedy as an involuntary nonsuit. 1 Bancroft, Code Practice and Remedies § 488; *Danforth v. Danforth,* 40 Nev 435, 166 P 927 (1917). Since the plaintiff's motion was not among those permitted by ORS 18.230, it would have been error to have granted it. If the proof of a counterclaim is insufficient, the plaintiff may challenge it after all of the evidence is in by a motion for a directed verdict, which, unlike an order of nonsuit, will be a determination upon the merits and a bar to further proceedings. *McCargar v. Wiley,* 112 Or 215, 229 P 665 (1924). The proper course was not followed in this case. The third assignment of error is without merit.

■■ We observe, however, that the record fails to show timely notice was given. Under our decisions the notice that is required is one which expressly or by necessary implication advises the warrantor that damages will be sought. *Howard-Cooper Corp. v. Umpqua Dredging & Construction Co.,* 148 Or 582, 36 P2d 590 (1934). It may be inferred from the evidence that the defendant complained to the plaintiff about the feed several times during the period that he continued to use it. These were general expressions of dissatisfaction, however, and not until July 1959 was a notice given that can be construed to meet the statutory requirement. An agent of the plaintiff who called on the defendant "in the early part of July" testified:

> "I went out to see Mr. Heidloff one morning and questioned him as to—if there was anything he needed, or we could do for him, and he said, 'Well, you'd have to see my attorney about that.'"

This is the kind of language that is ordinarily a prelude to a lawsuit. Moreover, by a letter dated July 9, 1959, the defendant's attorney wrote to the plaintiff as follows:

> "Under the circumstances Mr. Heidloff has authorized me to inform you that he hereby rescinds his agreement with you to pay for the feed delivered to him, and does hereby tender to you all of the unused feed located on his premises."

Although the legal theory on which these statements were based may not have been correct, we think the letter served to give the notice required by statute.

██ The problem remains as to whether this notice was given within a "reasonable time" after the buyer knew, or ought to have known of the breach. The question is sometimes one of law, sometimes one of fact. According to Williston (3 Williston, Sales, § 484a):

> "Here, as in other cases where a reasonable time must be determined, the question of what is a reasonable time in doubtful cases is for the jury to decide, but may be decided by the court if the facts permit but one conclusion."

On the record before the court we would have no hesitancy in deciding the issue against the defendant. Although suspicious of the feed almost from the date he started to use it, early in March 1959, he did not warn the plaintiff that damages would be sought until July of the same year, and during the interim accepted and used several shipments of the feed. Unless an earlier notice is proved on the retrial of the counter-claim, the defendant will not be permitted to recover damages for breach of warranty.

This brings us to the fourth assignment of error. The plaintiff asserts that the trial court erred in ad-

mitting evidence of an experiment conducted by the defendant with the plaintiff's feed. Testimony regarding the experiment was supplied by the defendant and by his neighbor, Roy Waters. The following discloses the manner in which this evidence was produced.

First, the defendant testified that he had "three or four tons" of the plaintiff's feed left over after marketing his pigs, and that a year later he put four pigs in the feed yard and started them on the feed. At this point the plaintiff made an objection and after some discussion the court retired to chambers to hear an offer of proof of the proposed experiment. The offer consisted of Waters' testimony, but the court was advised that the defendant would give substantially similar testimony. Waters testified that on February 7, 1960, approximately eleven months after the 1959 pigs were first placed on feed, the defendant put four sixty-pound "weaner" pigs in the feed pen. He testified that the 1959 pigs were "something under forty pounds" when placed on feed but that there was no other difference in circumstances other than that there were fewer pigs in the pen than in 1959. Waters then related that the pigs developed scours when fed the plaintiff's feed, but that the condition disappeared rapidly when another brand was substituted. The experiment was repeated, using the same pigs, with identical results.

The plaintiff thereupon objected to the offer of proof on the ground that "this isn't a demonstration or experiment in comparison with anything else. It doesn't show a thing," and on the further ground that "the experiment is not controlled, it doesn't have anything to measure it against." The objection was overruled. Then the parties returned to the court room and the defendant testified to the experiment. Ex-

amination elicited the fact that the four pigs were fed 12 per cent protein feed although it was customary to feed such pigs 16 per cent protein feed and reserve the 12 per cent feed for pigs weighing "around 125 pounds" or more.

At a later point in the proceedings Waters testified. The plaintiff again objected to any testimony about the experiment on the ground that "they are not the same pigs, they are not the same conditions, and from a scientific standpoint, the evidence is worthless." Waters' testimony brought out the fact that the plaintiff's feed had been stored loose in a machine shed with one side open.

■ Experimental evidence is admissible within the limited discretion of the trial court. The most frequently quoted test is that set forth by Justice LORD in *Leonard v. Southern Pac. Co.*, 21 Or 555, 28 P 887 (1892):

> "There seems to be some hesitation in receiving evidence of experiments or demonstrations, and from the liability to misconception and error there can be no doubt that it is essential that the experiments or demonstrations should be made under similar conditions and like circumstances. In all cases of this sort very much must necessarily be left to the discretion of the trial court, but when it appears that the experiment or demonstration has been made under conditions similar to those existing in the case in issue, its discretion ought not to be interfered with."

The corollary to this view was set forth in *Hall v. Brown*, 102 Or 389, 202 P 719 (1921), where it was stated that it "is not within the discretion of the court to admit evidence about experiments, unless the conditions are substantially alike." To the same effect

are *Loibl v. Niemi,* 214 Or 172, 327 P2d 786 (1958) ; *Tuite v. Union Pacific Stages, Inc.,* 204 Or 565, 284 P2d 333 (1955).

■ On the merits the experiment was not admissible in evidence because the conditions were dissimilar. The feed was one year old when used in the experiment, and it had been stored in a partially open shed. The protein content was insufficient for pigs of the weight used in the test. To admit evidence of the experiment when those circumstances were shown would have been an abuse of discretion if proper objections were made.

The grounds of the plaintiff's objection to the offer of proof were not clearly stated and only in a rough way advised the trial court of the plaintiff's contention that the experiment lacked scientific precision.

Moreover, it must be remembered that the trial court based its ruling solely upon facts brought out by the offer of proof, and not upon what was subsequently developed before the jury. Had the plaintiff moved to strike the testimony concerning the experiment after it was shown that the feed was of the wrong protein content, or when it appeared that it had been exposed to the weather in storage, the motion should have been granted since each of these facts conclusively established the plaintiff's contention that the conditions of the experiment were dissimilar. However, no motion was made.

■ If the court was right in overruling the plaintiff's objection to the offer of proof, then the objection was of no avail so far as the testimony given by the defendant was concerned, since an objection to a line of testimony will be deemed a continuing objection only when the original ruling of the court was in error. Cf. *Hryciuk v. Robinson,* 213 Or 542, 326 P2d 424,

(1958); *Noteboom v. Savin,* 213 Or 583, 322 P2d 916, 326 P2d 772 (1958).

■ Apart from the fact that the pigs used in the experiment were slightly heavier than the 1959 pigs, and that there were fewer of them, the only difference in conditions brought out in the offer of proof was the fact that the feed was a year old. Moreover, this was not made a subject of emphasis during the offer. We cannot say that the trial court abused its discretion in permitting the defendant's testimony. Moreover, we do not believe that the objection was sufficient to preserve the question for review.

However, the objection to Waters' subsequent testimony should have been sustained. It was made upon proper grounds, and at the time it already appeared from the evidence that the feed was of the wrong protein content as well as a year old. While Waters' testimony was cumulative, we cannot say that it was not prejudicial error to admit it. Waters was a disinterested witness whose statements might well be thought to have had greater weight with the jury than the same statements made by a party. We, therefore, sustain the fourth assignment of error.

■ Since it appears that the trial court instructed the jury to return a verdict in favor of the plaintiff and against the defendant for $1,510.47 (should be $1,510.37) on the plaintiff's complaint and since his action in so doing is not challenged on appeal it is not necessary upon remand to retry the merits of the complaint. The merits should be deemed established. After a retrial of the counterclaim in harmony with the foregoing holdings, the plaintiff should be awarded a judgment of $1,510.37 less whatever sum, if any, is awarded to the defendant upon his counterclaim.

Reversed and remanded.