Mike DeCICCO, dba Mike DeCicco & Son, Plaintiff,

v.

UNIROYAL, INC., a corporation, aka United States Rubber Company, a corporation, Defendant,

v.

Margaret M. DeCICCO, Third Party Defendant.

P. W. MacNAB and Helen MacNab, dba MacNab Tire Service, Plaintiffs,

v.

UNIROYAL, INC., a corporation, aka United States Rubber Company, a corporation, Defendant.

Civ. Nos. 67–232, 67–355, 67–365.

United States District Court
D. Oregon.
Oct. 24, 1968.

---

Roger G. Tilbury, Portland, Or., for plaintiff.

Norman J. Wiener, King, Miller, Anderson, Nash & Yerke, Portland, Or., for defendant.

## OPINION AND FINDINGS

KILKENNY, District Judge.

In this proceeding on the issues segregated for separate trial, DeCicco asserts

that Uniroyal breached its contract by selling him defective tires. DeCicco claims that he was unable to collect the purchase price or was required to make adjustments with his customers for the defective tires, and that many customers discontinued doing business with him, to his damage in the amount of $200,000.00.

Uniroyal has denied DeCicco's contentions. In addition, Uniroyal asserts a counterclaim against DeCicco in the amount of $42,578.17, for goods sold on open account. Uniroyal asserts a second counterclaim against DeCicco and third party defendant, Margaret M. DeCicco, for the sum of $43,323.63 on a demand note secured by a mortgage, and seeks a decree foreclosing the mortgage.

## AGREED FACTS

DeCicco is a citizen of the State of Oregon. For over forty years, DeCicco has been the proprietor of a business engaged in the sale of new tires and tubes, and in the recapping of used tires, and has properly filed his certificate of assumed business name. DeCicco's principal place of business is in Portland, Oregon. DeCicco has also had a place of business in Seattle, Washington, and DeCicco has serviced customers in the states of Oregon and Washington. After commencing business, DeCicco sold various brands of tires, including India, Mohawk, Federal, Kelly, Fisk, G&J, Gillette and Remington. In connection with his business, DeCicco has a warehouse in Portland, Oregon, as well as recapping facilities and a sales office.

Uniroyal, formerly United States Rubber Company, is a New Jersey corporation with its principal place of business in New York, New York. Uniroyal is a major manufacturer of tires, tubes and various rubber products. Its products are sold throughout the United States and in foreign countries.

"Gillette Tires" is a division of Uniroyal. Tires sold under the "Gillette" label are manufactured by Uniroyal.

Subsequent to 1942, DeCicco was a factory jobber for Gillette Tire Division, pursuant to various written "jobber" agreements. Under the terms of the jobber agreements, Uniroyal delivered tires, tubes and other goods to DeCicco's warehouse in Portland on consignment. In addition to goods purchased on consignment, DeCicco also purchased from Uniroyal goods on "dating" terms (goods sold with accounts to be paid at prescribed future date). Also, some goods were purchased on open account. DeCicco was not required to pay for goods placed in his warehouse on consignment until the goods were sold by DeCicco to his own customers. In effect, Uniroyal furnished DeCicco an inventory without DeCicco putting up any money. The amount to be paid by DeCicco to Uniroyal for goods withdrawn from consignment by DeCicco was determined by subtracting the physical inventory of goods in the warehouse at the end of the month, as determined by an inventory taken by DeCicco, from the total of goods on hand at the beginning of the month, plus goods placed in inventory. After the amount of withdrawals by DeCicco had been determined by that process, DeCicco was billed at discount prices in effect at the time of shipment.

By reason of the method of construction, individual rubber tires may be stronger or weaker than others, or may develop individual defects. Tires vary widely in design, construction, materials, quality and strength, and such differences are reflected in selling prices. These factors are recognized by the industry as a whole, and tire manufacturers and resellers of tires have developed various programs for replacing or giving allowances for tires which develop defects.

Under the terms of the jobber agreements entered into between DeCicco and Uniroyal, it agreed to handle all claims for adjustment or replacements of Gillette brand tires and tubes in accordance with its then current established procedure. In accordance with a procedure which went into effect in 1959, DeCicco was given an additional discount from purchase price in lieu of adjustment of

individual tires or tubes, except for certain tubes and tires in sizes 14.00 or larger, and for certain tubeless truck tires. From 1959 to 1961, the discount in lieu of adjustment was at the rate of 2½% of purchase price. The discount was increased to 3% effective January, 1961. Under the "discount in lieu of adjustment" policy, DeCicco was allowed to make adjustments or replacements with his own customers for tires or tubes determined by him to be defective. He made the decision whether to grant adjustment or make replacements and Uniroyal was not required to, and, in fact, did not inspect tires and tubes to determine whether they qualified for adjustment or replacements, except for some truck tires in sizes 14.00 or larger, and certain tubeless truck tires.

As of December 19, 1963, DeCicco was indebted to Uniroyal for goods purchased from Uniroyal. On that date, DeCicco and Margaret M. DeCicco, his wife, executed a demand note payable to Uniroyal in the sum of $85,000.00. On the same date, DeCicco and Margaret M. DeCicco executed a mortgage covering property described as shown on Exhibit A,[1] as security for their indebtedness to Uniroyal. On September 4, 1963, DeCicco executed a financing agreement, granting Uniroyal a security interest in his inventory and in his accounts receivable, among other properties. On June 28, 1963, DeCicco executed a franchise agreement to commence in effect as of May 1, 1963, and continue through December 31, 1967. Such agreement was terminable without cause by either party, upon 30 days' written notice. At or about the same time the franchise agreement was entered into, DeCicco and Uniroyal executed a warehouse supplement to the franchise agreement. Such agreement provided in part:

"7. On all shipments by the Warehouse Jobber of stock warehoused under this agreement to the Company's Jobbers and to others pursuant to paragraph 3 of this agreement, the Company will allow the Warehouse Jobber a commission of three percent (3%) of the Factory Jobber value of the merchandise so delivered. This commission will not apply to any withdrawals for delivery to customers of the Warehouse Jobber, or to occasional deliveries from said stock to the Company's branches or to other warehouses on the Company's request. The Company may upon mutual agreement ship Gillette merchandise directly to its customers within that territory in which the Warehouse Jobber may at any time be a franchised Gillette dealer without allowing to the Warehouse Jobber any commission on such shipments. The above mentioned commission shall be in full compensation and reimbursement to the Warehouse Jobber for its overhead and out-of-pocket expenses, paid in maintaining facilities and performing all functions under this agreement."

During the following years, DeCicco made purchases from Uniroyal of Uniroyal products in the following amounts:

| Year | Amount |
|------|--------|
| 1961 | $324,045.00 |
| 1962 | 454,200.00 |
| 1963 | 209,200.00 |
| 1964 | 388,600.00 |
| 1965 | 15,400.00 |

DeCicco's sales, in terms of dollars and profits on sale for the years 1960, 1961, 1962, 1963, 1964 and 1965 were as follows:

| Year | Gross Sales | Purchases | Profit or Loss |
|------|-------------|-----------|----------------|
| 1960 | $712,473.14 | $578,118.00 | $ 1,924.82 |
| 1961 | 600,108.64 | 476,981.00 | 5,403.97 |
| 1962 | 682,237.95 | 564,394.00 | 5,065.85 |
| 1963 | 527,567.52 | 447,558.00 | (44,056.10) |
| 1964 | 753,987.61 | 629,938.71 | (28,182.63) |
| 1965 | 390,890.55 | | (95,909.50) |

1. Attached to the pre-trial order.

The basic jobber contract between plaintiff and defendant provided, that U. S. Rubber: "will provide a quality line of merchandise sufficiently complete to enable the Wholesale Distributor to solicit all classes of trade on Gillette merchandise regularly distributed by the Company." This agreement was drafted by defendant.

On July 2, 1965, defendant seized virtually all of DeCicco's merchandise. The contract, in effect on the date of the seizure, provided: "it may be canceled by either party at any time by thirty days' written notice." The mortgage executed by DeCicco was due and payable at said time.

The issues of fact, outlined in the pre-trial order, are as follows:

1. Whether there was any agreement, express or implied, on the part of Uniroyal to sell rubber products to DeCicco of a given standard or quality and whether Uniroyal breached any such agreement by selling goods to DeCicco, all or a substantial part of which did not meet quality standards, taking into account the type of tire and cost.

2. Whether DeCicco suffered any damages as a result of breach of agreement on the part of Uniroyal.

3. Whether DeCicco gave timely notice to Uniroyal that all or a substantial part of the goods purchased by him were not of the price and quality standard in the industry.

4. Whether DeCicco continued to do business with Uniroyal after discovering defects in Uniroyal's rubber products, if any such existed.

5. Whether there is a custom and practice in the industry that adjustments or replacements of defective rubber products are to be compensated for by additional discounts or by adjustment of individual tires by the manufacturer, and whether such custom and practice was recognized by DeCicco and Uniroyal.

6. Whether DeCicco agreed to accept a 3 percent discount in lieu of adjustment of all tires and tubes, except for certain tubeless truck tires and truck tires in sizes 14.00 or larger.

7. Whether the tubeless truck tires and truck tires in sizes 14.00 or larger were to be individually adjusted on a wear basis at such times as DeCicco accumulated a sufficient number of tires for inspection, gave notice thereof to Uniroyal, and made application to Uniroyal for credit in proper form.

8. Whether Uniroyal did, in fact, make allowances and give DeCicco credit for adjustments and replacements.

9. Whether it was understood and agreed by DeCicco and Uniroyal that Uniroyal's sole responsibility in the event of defects in its products was to make adjustments or grant discounts in lieu of adjustments.

10. Whether DeCicco is indebted to Uniroyal in the sum of $42,578.17 for goods sold on open account.

11. Whether DeCicco and Margaret M. DeCicco are indebted to Uniroyal in the sum of $43,323.63 on their demand note, executed December 19, 1963, and secured by a mortgage of even date.

12. Whether Uniroyal is entitled to recover the sum of $7,500.00 from DeCicco and Margaret M. DeCicco for its attorneys' fees in this action.

13. Whether DeCicco agreed to accept a 3 percent commission as compensation for his services, for use of his warehouse space, and for performing all his functions for Uniroyal, and whether that commission has been received by him.

14. Whether U. S. Rubber Company waived its right to foreclose its mortgage in view of the fact that on July 9, 1965, it agreed that it would "make no claim of right or security under previous security agreement."

## JURISDICTION

I resolve this issue against the defendant and hold that the Court has diversity jurisdiction. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938), Liberty Mutual Ins. Co. v. Horton, 275 F.2d 148 (5th Cir. 1960), aff'd 367 U.S.

348, 353, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961).

## STATUTE OF LIMITATIONS

■■ An action for breach of warranty is regarded as an action on contract. Wells v. Oldsmobile, 147 Or. 687, 35 P.2d 232 (1934). ORS 12.080, the Oregon six year statute of limitations is applicable. Here, I am not concerned with the four year statute of limitations of the Uniform Commercial Code which was not effective until the indicated date in 1963. The enactment of the latter did not effect the statute in existence at the time the cause of action accrued. Clarizo v. Spada Distributing Co., 231 Or. 516, 373 P.2d 689 (1962). DeCicco's claims for breach of warranty were not part of the mutual open and current accounts recognized in ORS 12.090.

■ Inasmuch as this action was commenced on June 16, 1967, all claims for breaches of warranty occurring prior to June 16, 1961, are barred. Presently, I am not speaking on DeCicco's alleged "offsets" to defendant's counterclaim.

## ON THE MERITS

At the risk of repetition, I shall restate a segment of the facts. By reason of a number of written "Jobber" agreements in effect between the parties for a great many years, Uniroyal, and its predecessor, delivered tires, tubes and other goods, on consignment, to DeCicco's warehouse in Portland. He was not required to pay for the goods on consignment until they were sold. Additionally, he purchased tires on "dating" terms, that is goods delivered on accounts to be paid for at times certain in the future. Moreover, he purchased a number of tires on open account. The latter were designated as his "owned" inventory.

The Jobber agreements required Uniroyal to handle all claims for adjustment or replacement of Gillette tires and tubes in accordance with the then current procedures. A number of programs were developed for replacing or giving an allowance on defective tires.

These programs were similar to those developed by other tire manufacturers. The industry recognizes that tires vary widely in design, construction, materials, quality and strength. The custom and practice in the entire tire industry was to develop various programs to compensate tire dealers for cost of adjusting or replacing defective tires.

In 1959, Uniroyal placed a "discount in lieu of adjustment" policy in effect. This was a uniform program with all Uniroyal dealers. Under the program, DeCicco was given an additional discount from the purchase price in lieu of the manufacturer's adjustment of individual tires or tubes. From 1959 to 1961, this discount was at the rate of 2½% of the total purchase price. The discount was increased to 3% of the purchase price commencing January, 1961. Certain tubeless truck tires and other large tires in sizes 14.00 cross section or larger were exempted from this policy. As to the latter, the old program of replacing tires continued. There is no question but that the new arrangement offered advantages to both parties. For example, DeCicco had the decisional power on what were or were not defective tires and could make adjustments for reasons having nothing to do with the condition of the tire at the time it was delivered, such as road hazards or unusual conditions of use. Conversely, Uniroyal had no power to inspect the tires and determine whether the defects qualified for adjustment or replacement, except for the large tires and certain truck tires previously mentioned.

The record discloses that DeCicco was a very successful tire dealer to the mid-fifties. From 1958 on, he was faced with problems, personal and otherwise, so that his net worth declined each successive year. The decline in net worth prior to 1963 was due to withdrawals from the business in excess of the earnings. After 1963, his losses were substantial.

· The record supports a finding that in 1959, 1960, and at least one-half of the

year 1961, Uniroyal, with the remainder of the tire manufacturers, was facing a rather serious problem with its Gillette type tubeless tires, and its other tires, including large truck tires with tubes. One of the problems was leaks, another tread separation, and other defects. There is no doubt that during this period the adjustments made by DeCicco exceeded his allowable 3% "discount in lieu of adjustments." For that matter, the record supports a finding that the adjustments due to defects in the Gillette tires during that period equalled 10% of the purchase price.

Returning for a moment to DeCicco's financial problems. As early as 1958, his steady decline in net worth caused him to rely on short-term financing and on extended terms on purchases from suppliers. His financial problems continued to expand in 1959, 1960, 1961 and 1962, so that by the latter part of 1963, he was heavily indebted to Uniroyal for tires purchased on open account. By the latter part of 1963, his financial condition was such that Uniroyal demanded and obtained a promissory note for $85,000.00, secured by a mortgage on the debtor's real property. The note was signed by the debtor and his wife and is here the subject of a counterclaim.

In 1964, his picture worsened. With very late payments on open accounts and with approximately $100,000.00 of his accounts receivable in two extremely questionable accounts, the outlook was dark. Additionally, he owed $85,000.00 to Dunlop, another one of his major suppliers. Plaintiff's claim is based on breaches of defendant's warranty to "provide a quality line of merchandise for the factory jobber", and the language of the lifetime guarantees which were expressly stated to be "without limits as to time or mileage." The latter guaranty had been passed along to the customers. Additionally, he relies on an implied warranty that the tires were fit for the use intended.

Although DeCicco cites many sections of the Uniform Commercial Code, the fact remains that this Code did not become effective until September 1, 1963, long subsequent to the delivery of the last of the defective tires, and I so find. However, the Oregon Uniform Sales Act was in effect during the critical period and for the purposes of this discussion, the two acts were equivalent of each other, if not identical.

BREACHES OF WARRANTY

Already, I have found that the breaches of warranty subsequent to July 1, 1961, were minimal in character and were so recognized by the parties. There was some dissatisfaction in 1962 as evidenced by DeCicco's letter of June 13th of that year and an earlier letter of February 8, 1962, from DeCicco to McLaughlin, but this seems to have been adjusted between the parties. A few other instances could be cited, but in the main, the complaints after mid-year 1961 were quite isolated. Obviously, as early as January 1, 1961, the parties believed the problem had been solved. On that date, DeCicco entered into an entirely new Gillette jobbers consignment agreement under which tires were to be inventoried by Uniroyal with DeCicco up to a value of $150,000.00. It is highly unlikely that this new agreement would have been executed, had the defective tire problem continued to that time. The agreed facts show that in 1961, he made purchases from Uniroyal of its products in the sum of $324,000.00, while in 1962, he made purchases in the sum of $454,200.00. Clearly, he would not take a chance on a 25% increase in purchases if he believed that he was then purchasing a defective product. On January 19, 1961, Uniroyal directed a lengthy letter to DeCicco with reference to certain discounts and resale prices on sales to counties, cities and municipalities. Again, no objection.

Fortifying Uniroyal's position that its rubber products were satisfactory during 1962 and 1963, is the warehouse supplement to the Gillette franchise agreement dated May 1, 1963, which covered a period of time to December 31, 1967. DeCicco, an astute business man, would never have committed himself for that

period and signed this supplement if Uniroyal had been supplying him with defective rubber products at that time or in the immediate past. On September 4, 1963, DeCicco, experiencing financial difficulties, executed a financing statement and an elaborate security agreement in favor of Uniroyal. This instrument recites that DeCicco had sold the defendant's products in the past and contemplates selling its tires, tubes and other merchandise in the future. Again, would DeCicco sign such an agreement if, in fact, the Gillette tires were then defective or had been defective in the recent past? Here, I must assume that these private transactions were fair and regular, that the ordinary course of business had been followed and that these transactions happened according to the ordinary course of nature and the ordinary habits of life. Later, on December 19th of the same year, the plaintiff and his wife executed and delivered to Uniroyal a note in the sum of $85,000.00, secured by a mortgage on certain of plaintiff's real property, the instrument here the subject of one of defendant's counterclaims.

I had a chance to see and observe the witnesses while on the witness stand. I do not believe there were any substantial breaches of warranty after July 1, 1961, and certainly not after January 1, 1962. What occurred thereafter amounted to nothing more than what was anticipated between the parties when they agreed to the 3% discount in lieu of adjustments.

We must recall that DeCicco, at all times, took advantage of the 3% discount and although defendant had notice of defects in tires from time to time and, in particular, in 1959, 1960, and at least a part of 1961, no formal claim of breach of warranty was made by DeCicco and this is particularly true after January 1, 1962. At no time, was DeCicco relying on a theory of breach of warranty. On the other hand, he wanted to continue the splendid relationship which had existed in the past and obviously wanted to sell Gillette tires. For that matter, he continued to sell these tires down to the time when Uniroyal took possession of the stock of merchandise in July, 1965.

ORS 75.490, in effect until September 1, 1963, required the buyer to notify the seller, not only of the alleged breach of warranty, but also that he intended to claim damages for such breach. Howard-Cooper Corp. v. Umpqua Dredging & Construction Co., 148 Or. 582, 585, 36 P.2d 590 (1934), Western Feed Co. v. Heidloff, 230 Or. 324, 370 P.2d 612 (1962).

Of particular application is Adler v. United States, 270 F.2d 715 (8th Cir. 1959). On the evidence before me, I must find that plaintiff's complaints amounted to nothing more than an expression of dissatisfaction with the tires in 1959, 1960 and 1961, both parties being always of the belief that the expertise of Uniroyal would solve the problem.

■ At the close of the trial, and for some time thereafter, I was of the belief that the complaints made by plaintiff constituted sufficient notice to Uniroyal of the breaches of warranty. Reexamination of the record, when viewed in the light of the cases above mentioned, convinces me that DeCicco's complaints did not rise to the dignity of a notice within the meaning of the Oregon statute. His interest was in securing a better tire. He was receiving the 3% discount and had no thought of making a claim for breach of warranty. Accordingly, any breaches which may have occurred prior, and subsequent, to those barred by the statute of limitations are invalid by reason of failure to give proper notice of the breaches.

FINDINGS ON ISSUES

(1) On issue of fact number 1, I find there was an agreement, both express and implied, on the part of Uniroyal and its predecessor in interest, to sell rubber products to DeCicco of a given standard or quality and that such an agreement was breached by selling goods to DeCicco in 1959, 1960 and to July 1,

1961, a substantial part of which did not meet quality standards, taking into account the type of the tire and the cost.

(2) I find that 10% of the dollar value of Gillette tires delivered by defendant during such time did not meet the quality standard above mentioned and that DeCicco suffered damages equal to the difference between the 3% discount on the purchase price of the Gillette tires and the 10% just mentioned. I find that DeCicco suffered no damage after January 1, 1962.

(3) I find that DeCicco failed to give legal notice to Uniroyal that a substantial part of the goods purchased by him prior, or subsequent, to July 1, 1961, were not of the proper quality standard in the industry, or that such goods were not fit for the use intended, or of any other warranty that might have been made or given by Uniroyal to DeCicco.

(4) DeCicco continued to do business with Uniroyal after discovering defects in uniform rubber products and failed to give legal notice to Uniroyal of such defects.

(5) There is a custom and practice in the industry that adjustments or replacements of defective rubber products are to be compensated for by additional discounts or adjustment of individual tires by the manufacturer. Such custom and practice applies to all the usual and customary defects in tires, but does not apply where there is substantial breach of a warranty in the sale of rubber products of a given standard or quality, such as here exists.

(6) DeCicco agreed to accept a 3% discount in lieu of adjustment on all tires and tubes, except for certain tubeless truck tires and truck tires of sizes 14.00 or larger. However, such agreement was predicated on a warranty to receive rubber products of a given standard as alleged by plaintiff.

(7) Tubeless truck tires and truck tires and tubes in sizes 14.00 or larger were to be individually adjusted on a wear basis at such time as DeCicco accumulated a sufficient number of tires for inspection. He gave notice to Uniroyal and made application for credit in proper form.

(8) Uniroyal did, in fact, make allowances and gave DeCicco credit for adjustments and replacements pursuant to the agreement set forth in number (7). It was not understood and agreed by DeCicco and Uniroyal that Uniroyal's sole responsibility for defects in Gillette tires was to give a 3% discount in lieu of adjustments.

(9) DeCicco is indebted to Uniroyal in the sum of $42,578.17 for goods sold on open account.

(10) DeCicco and his wife are indebted to Uniroyal in the sum of $43,323.63 on their demand note, executed December 19, 1963, and secured by a mortgage of even date.

(11) Uniroyal is entitled to recover the sum of $2,500.00 from DeCicco and Margaret M. DeCicco for its attorney fees in foreclosing said mortgage.

(12) DeCicco agreed to accept a 3% commission as compensation for his services, for use of his warehouse base, and for performing all of his functions for Uniroyal and that commission has been received by him.

(13) U. S. Rubber did not waive its right to foreclose its mortgage by reason of the fact that on July 9, 1965, it agreed that it would "make no claim of right or security under previous security agreement." This language is applicable to the security agreement executed by DeCicco, rather than the mortgage executed by DeCicco and wife.

## FUTURE PROFITS

Assuming that the Court of Appeals may take a different view than mine on the issues of liability and hold that my findings are clearly erroneous, I probably should express my views on the issue of future profits as an item of damage. Plaintiff's entire theory of a money recovery seems to be based on future profits. Damages are recoverable for loss of profits in an action for a breach of contract only to the extent that the

evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. Stubblefield v. Montgomery Ward & Co., 163 Or. 432, 96 P.2d 774, 125 A.L.R. 1228, rehearing denied 163 Or. 432, 98 P.2d 14 (1940), Cluck v. Fish, 230 Or. 63, 368 P.2d 626 (1962). Loss of profits must not be uncertain and speculative. Western Rebuilders & Tractor Parts, Inc. v. Felmley, 237 Or. 191, 386 P.2d 813, 391 P.2d 383 (1964). Cases involving the sale of tires, which state essentially the same rule are Michelin Tire Co. v. Shultz, 295 Pa. 140, 145 A. 67 (1929), Armstrong Rubber Co. v. Griffith, 43 F.2d 689 (2d Cir. 1930).

In approaching this issue, we must keep in mind that plaintiff, during the stated period, carried an entirely separate and distinct line of tires and sold products, which were in no way connected with the Uniroyal franchise. The record clearly shows that the plaintiff's operations were unprofitable during the years 1958, 59, 60, 61 and following years. The evidence does not afford a basis for separating the loss, if any, attributable to defendant's actions, from loss, if any, which might have been caused by factors over which defendant had no control, or other causes such as management problems and plaintiff's health. The exhibits prepared by the accountant called as a witness by the plaintiff are not based on evidence in the record, but on pure speculation, hearsay and guesswork. When he left the witness stand, I was convinced that he was pulling figures out of thin air and that his estimates on profits were imaginative and completely unreliable.

 Aside from this finding, it is a general rule that estimates or summaries, such as the accountant's exhibits offered in support of lost profits, must have some basis, in fact, in the evidence, i. e. that the books themselves are in evidence or that they are available for immediate examination. Federal Reserve Bank of San Francisco v. Idaho

Grimm Alfalfa Seed Growers Ass'n, 8 F.2d 922 (9th Cir. 1925), Greenbaum v. United States, 80 F.2d 113 (9th Cir. 1935). For that matter, the accountant's own testimony shows that his estimates of profits were not confined to the books and the records of plaintiff. Clearly, the offered exhibits on lost profits are not admissible.

Subsequent to the trial, I indicated to counsel that there might be a basis for a damage award of between $50,000.00 and $85,000.00. At that time, I did not realize that the statute of limitations would bar all claims for breaches prior to June, 1961. Moreover, I was of the impression that DeCicco's complaints constituted legal notice of the breaches and that recovery could be had for damages for those years measured by approximately 7%,[2] of the total of the purchase price of Gillette tires during those years. For example, DeCicco's total purchases from Uniroyal of Uniroyal products in 1961 was $324,045.00. Thus, if $300,000.00 was the total price of Gillette tires, the damage for the full year would be $21,000.00. Of course, no such allowance can be made by reason of my finding that the statute of limitation applies and that no consequential breaches occurred after mid-1961. Besides, DeCicco never complied with the statutory requirement that notice be given of the breaches.

## OFFSETS

 Not until the lodging of the pre-trial order on April 22, 1968, did the plaintiff assert his claim for alleged offsets against the defendant's counterclaims. The principal items of the offsets are grounded on an alleged seizure and conversion by defendant of DeCicco's merchandise accounts receivable, tires, etc. on or about July 2, 1965. In other words, DeCicco's claims arise from conversion of his property. Defendant insists that the two year statute of limitation applies and that the claimed offsets are barred by ORS 12.110. I dis-

---

**2.** Difference between 3% adjustment allowed and 10%.

agree. ORS 12.080(4) is, in my opinion, the applicable statute. Johnson v. Earle, 162 F.Supp. 149 (D.Or.1958), aff'd 313 F.2d 686 (9th Cir. 1962), cert. denied 373 U.S. 910, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963).

However, I find that plaintiff waived any possible rights he may have had by reason of any alleged unlawful taking, when he signed the agreement of July 9, 1965, under the terms of which the parties outlined a method of liquidation of tires, tubes, accounts receivable and other property of plaintiff, then possessed by defendant. The agreement recites that on July 2, 1965, defendant repossessed itself of the stock of Gillette truck and passenger tires, tubes, etc. held on consignment *and otherwise* by second party, that an action for claim and delivery had been instituted on the same date to take possession of the inventory of Remington passenger, truck and heavy service tires and tubes in the possession of the second party as of that date, that a list of creditors of plaintiff had been delivered to the second party as of July 8th. In the instrument, the plaintiff agreed to sign a letter directed to each of his creditors. An arrangement was made for deposit of all collections. Defendant was required to prepare a detailed inventory of all tires and tubes of which it took possession, deliver a copy thereof to DeCicco and to the Dunlop Tire and Rubber Company. Defendant further agreed to give due credit to plaintiff for all rubber repossessed at inventory prices. Defendant obligated itself to make a monthly accounting to the plaintiff until the liquidation of the accounts and the disposition of the rubber inventory. Defendant further obligated itself to pay all surpluses to Dunlop to apply on its account for the tires and tubes delivered to DeCicco. *Defendant further obligated itself to make no charge for the collection or for the liquidation of the accounts and merchandise except necessary court costs and attorney fees incurred in connection with the collection of the accounts receivable.* I find

that this instrument amounted to nothing less than a compete compromise and settlement of any possible conversion claims that plaintiff might have had against the defendant. Many of the accounts receivable were uncollectible and on some of the large ones only a small percentage was collected. On one $37,532.14 account, only $12,400.00 was collected. Defendant has made a full and complete accounting for the accounts collected. Additionally, plaintiff's offset claims for outdoor advertising, radio advertising, Gillette. bowling teams, telephone advertising, rent for warehouse space, lighted Gillette neon signs, excise tax paid to the State of Washington and cost of lighting Gillette neon signs are purely speculative and conjectural and there is no basis in the evidence for an award of damages on said claims.

Finally, no amount of sophisticated argument can convince me that plaintiff signed the agreement of July 9, 1965, while under pressure, or that he had any thought at that time of reserving claims against the defendant for the conversion of the property. The plaintiff's argument on these offsets, though vigorously asserted and adroitly phrased, is completely unsupported by substantial evidence.

I find that DeCicco is entitled to a credit for interest paid as of February 20, 1963, in the sum of $584.01, another credit in the sum of $454.61 for personal property tax paid on U. S. Rubber Company owned stock and another credit in the sum of $300.00 for main floor warehouse space used by 193 defective truck tires at the direction of the defendant. Credit should also be allowed for the personal property tax payments paid on August 8, 1966, in the amount of $678.05 and on September 20, 1966, in the sum of $678.05. These items to be credited against the open account indebtedness of plaintiff to defendant.

## EXHIBITS

I rule as follows on the exhibits on which ruling was reserved at the time of the trial.

The objections to plaintiff's Exhibits 1, 2, 6 and 17 are sustained. The objections to plaintiff's Exhibits 4 and 139 are overruled.

The foregoing shall serve as my findings and conclusions. It is my belief that a formal judgment and decree of foreclosure should be drafted in conformity herewith. This is true even though the parties agreed that a final judgment should not be entered in this case until Civil 67–232 had been tried and decided. In other words, if an appeal is to be prosecuted from the judgment and decree entered in this case, such an appeal should not await the decision in Civil 67–232. Although the MacNab case was mentioned in the caption and in the consolidation, the issues in that case were not here argued or presented.

## SUPPLEMENTAL FINDINGS AND ORDER

Based upon the defendant's objections and on the record in this cause, the Court makes and enters the following supplemental findings.

### I.

Plaintiff is entitled to the credit of $20,000.00 on its open account with defendant, as of the date of the payment, in connection with the account of Kern Tip.

### II.

The Ober judgment is now on appeal to the Supreme Court of the State of Oregon. The bond on appeal is supersedeas in nature. The judgment in that case is not a proper counterclaim or offset in this cause.

### III.

There is no credible evidence supporting plaintiff's claim that he should receive credit for curing tubes, over and above the credit already shown. Plaintiff has received credit from defendant for the Remington tires removed from plaintiff's premises on July 2, 1965, in the sum of $6,000.00. I find such credit is reasonable. I find nothing in the record which would support a finding of credit in favor of plaintiff on account of the collection of Discount Tires, other than a check which was received in the sum of $1,043.75, which was credited to the defendant by the plaintiff.

### IV.

 Plaintiff is correct in his position that the general statute of limitations does not bar the assertion of a claim by way of recoupment. However, the plaintiff has the burden of establishing such claims by a preponderance of the evidence. This he has failed to do, except in the particulars mentioned in the original opinion.

These supplemental findings and my original opinion shall serve as my findings and conclusions in this cause. Counsel for defendant shall prepare, serve and present a judgment and decree of foreclosure in conformity herewith.