Argued June 3, reversed and remanded July 17, 1975

JORRITSMA, *Respondent, v.* FARMERS' FEED
& SUPPLY COMPANY, INC., *Appellant.*

538 P2d 61

500

*J. D. Bailey,* of Schwenn, Bradley, Batchelor & Bailey, Hillsboro, argued the cause and filed the brief for appellant.

*Keith D. Evans,* Salem, argued the cause and filed the brief for respondent.

TONGUE, J.

This is an action for damages for breach of warranty by a dairy farmer against a feed processor and supplier. The complaint alleges breach of both an express warranty that the feed contained at least 16 per cent protein and an implied warranty that "it was of merchantable quality and reasonably fit and suitable for its general purpose and ordinary use and the commercial feeding of dairy cattle." The case was tried before the court, sitting without a jury. The court made a general finding of fact in favor of plaintiff and entered judgment in the sum of $8,338.78.[1] Defendant appeals.

Because we must consider a finding of fact in an action at law by a court, sitting without a jury, the same as the verdict of a jury, we must affirm such a finding if supported by any substantial evidence. *Cronn. v. Fisher,* 245 Or 407, 415, 422 P2d 276 (1966). For the same reasons, we must give plaintiff the benefit of all favorable evidence and of all favorable inferences which may be reasonably drawn from such evidence. *Emerson v. Western Photo-Mount Co.,* 267

---

[1] The court also made a general finding that defendant had "failed to establish his further and separate answer and defense to a preponderance of the evidence."

Or 562, 564, 518 P2d 171 (1974). Cf. *Pakos v. Clark,* 253 Or 113, 116, 453 P2d 682 (1969).

1. *The evidence was insufficient to establish an express warranty.*

Plaintiff's complaint alleged:

"That in October, 1971, the defendant's representative induced the plaintiff to buy a dairy mix feed produced by the defendant company upon the express representation that said feed was good and suitable dairy feed containing at least 16% protein."

Defendant's first assignment of error is that the trial court erred in holding that defendant expressly warranted to the plaintiff that the feed defendant delivered to the plaintiff had a protein content of not less than 16 per cent.[2] A consideration of that assignment of error requires a review of the evidence on this issue.

Plaintiff is a dairy farmer near Aurora. Before September 1971 he purchased from Purina a feed consisting of a mix of pellets and rolled grain with a 16 per cent protein content. Because Purina then raised its price, plaintiff called James Larkins, an employee of defendant, and asked "what he wanted for his 16 percent protein dairy mix." Mr. Larkins then quoted a price agreeable to plaintiff.

The first load delivered by defendant, however, was not a "mix," but consisted of pellets only, with an invoice for "16 [per cent] dairy [feed]." Plaintiff then told Mr. Larkins that he was "feeding coarse" and was told by Larkins that the next load would be "coarse, rolled mix grain in it."

---

[2] The trial court made no such separate finding. For the purposes of this opinion, however, it will be assumed that such a finding was implicit in its general finding in favor of the plaintiff.

The subsequent deliveries were made with "delivery slips" or invoices listing "16% pellets" and "roll mix" in various proportions, ranging from "3/5 16%" and "2/5 roll mix" in October 1971 to "6 ton 16%" and "5 T rolled mix" in February 1972. Attached to most of these invoices was a printed "card" or "tag" with the heading "TOP NOTCH 16% Dairy Feed," stating that the "guaranteed analysis" included "Crude Protein, not less than 16.00 [per cent]" and listing the various ingredients.

Plaintiff testified that in ordering and accepting these subsequent deliveries he was "of the understanding that it was 16 per cent feed just the same," i.e., that the total "mix," including the added rolled grain, had a 16 per cent protein content. He acknowledged, however, that he never asked what was the protein content of either the total "mix" or the added rolled grain and also did not discuss the proportion of the "mix" of 16 per cent pellets and rolled grain.

In February 1972, after his milk production had dropped and after experiencing other problems described below, plaintiff had the feed tested. These tests showed that the total "mix" had a protein content of between 11 and 12 per cent. In late February plaintiff showed the results of these tests to Mr. Larkins and was told that the total mix did not have a 16 per cent protein content because the rolled grain "never went over 9 or 10% protein." Plaintiff testified that this was the first time that he was aware of that fact.

Defendant's witnesses testified that defendant sold dairy feed with varying protein contents, ranging from 9 to 16 per cent; that the "tag" describing the "TOP NOTCH 16% Dairy Feed" and its ingredients referred to the pellets only, as required by law; that there is no such requirement for a "tag" stating the protein content and ingredients of the rolled grain;

that different dairy farmers desired different "mixes," with different proportions of pellets and rolled grain; that more "high energy low protein" feed was sold than any other kind; that it would have been "simple" to prepare a "mix" with a 16 per cent protein content, but that plaintiff made no such request.

On this state of the record we hold that there was no substantial evidence to support plaintiff's contention that defendant made an express warranty to him, within the requirements of the Uniform Commercial Code, ORS 72.3130,[9] that the dairy feed delivered to him, including both pellets and rolled grain, had a protein content of not less than 16 per cent.

As stated in the "Comment" included in the "1958 Official Text" at the time of the adoption of that statute in Oregon:

> "ORS 72.3130 deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a

---

[9] The requirements for an express warranty, as provided by ORS 72.3130, are as follows:

"(1) Express warranties by the seller are created as follows:

"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

"(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

"(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. * * *"

To the same effect, as stated in *A. A. Baxter Corp. v. Colt Industries, Inc.,* 10 Cal App 3d 144, 88 Cal Rptr 842 (1970), at 153-54:

"A warranty is as much one of the elements of sale and as much a part of the contract of sale as any other portion of the contract and is not a mere collateral undertaking [citing cases].

"There is a definite distinction between a fraudulent representation and a warranty. A fraudulent representation is an antecedent statement made as an inducement to the contract, but is not a part or element of the contract. On the other hand, to constitute an express warranty, the statement must be a part of the contract. [Citing cases]"

As also stated in *Atlanta Tallow Co. v. John W. Eshelman & Sons, Inc.,* 110 Ga App 737, 140 SE2d 118, 127 (1964):

"* * * An express warranty is a contract, and in order for a petition to set forth a cause of action based thereon it is essential that it show that both parties to the alleged contract understood and agreed to the same thing. * * *"

Cf. *Klimek v. Perisich,* 231 Or 71, 78-80, 371 P2d 956 (1962).

■ Thus, although an express warranty may not be a separate contract, it is a part of the contract of sale. As such, if it appears from the evidence that the parties did not "understand and agree to the same thing," it necessarily follows that the plaintiff has failed to sustain his burden of proof to establish the existence of an express warranty.

Plaintiff relies on two facts to establish an

express warranty: First, the fact that when plaintiff initially ordered feed from defendant he requested that it have a 16 per cent protein content; and, Second, the fact that each delivery of feed was accompanied by a "tag" which was labeled "16% DAIRY FEED."

The first fact—that plaintiff had ordered 16 per cent feed—would, on its face, appear to be a "description of the goods" establishing an express warranty under ORS 72.3130(1)(b). A specific order for feed with a 16 per cent protein content would, if accepted, be sufficient to establish that protein content as part of the basis of the bargain. In response to that order, however, defendant delivered a load of feed consisting entirely of pellets with a protein content of 16 per cent. Plaintiff seeks no damages as a result of that first delivery in October 1971.

Upon receiving that first delivery of feed and realizing that it consisted entirely of pellets, plaintiff then asked that future deliveries contain rolled grain as well. When he thus modified his original order by requesting a mix "of pellets and rolled grain," plaintiff did not reassert his demand for a 16 per cent "feed" and defendant made no express representation that the "mix" as subsequently delivered contained 16 per cent protein. Although plaintiff testified that *he* understood he was receiving that percentage, that evidence was insufficient to establish that *both* parties had such an understanding, as necessary in this case to sustain plaintiff's contention that defendant expressly warranted that the feed contained at least 16 per cent protein.

Neither is such an understanding established by the "tags" attached to the delivery slips. These "tags," when considered together with the delivery slips, obviously referred to the protein contents of the pellets, rather than that of the total "mix," including the

rolled grain. The delivery slips referred not only to the "16% pellets" (described by the "tags"), but also referred specifically to the "rolled mix" of added grain.

Accordingly, we hold that the evidence of these "tags" was insufficient, either separately or when considered with the facts relating to the orders placed by plaintiff with defendant, to sustain plaintiff's contention that defendant expressly warranted that the subsequent deliveries of the "mix" feed contained at least 16 per cent protein. At the most, the evidence established that there was a misunderstanding between himself and defendant as to the protein content of the cattle feed. While such evidence may be sufficient to sustain a suit to rescind a contract, it is not sufficient to establish an express warranty.

2. *The evidence was sufficient to establish the breach of an implied warranty.*

Plaintiff's complaint alleged:

"III

"That in selling said feed to the plaintiff, the defendant impliedly warranted that it was of merchantable quality and reasonably fit and suitable for its general purpose and ordinary use and the commercial feeding of dairy cattle.

"IV

"That the said feed was not, in fact, of merchantable quality and fit for its general purpose as warranted by the defendant in that the feed was malodorous and unpalatable and contained 11% to 12% protein, causing the cows to become ill, and their lactation periods to terminate early."

Defendant contends that "no evidence at trial supported such a claim * * * except certain deliveries in January and February of 1972, when 'fines' and 'odor' were discovered"; that this evidence did not support a finding of breach of implied warranty,

and that plaintiff "accepted the feed, \* \* \* fed it to his cows, ordered more feed, and fed it to the cows too," and that "there was no evidence that the feed was harmful." Defendant also contends that there was no evidence to show that a breach of such a warranty caused any of the "herd problems alleged by plaintiff."

To the contrary, plaintiff testified that the first load of feed in January "smelled bad" and had "fines" in it; i.e., pellets that were "broken up" or which had disintegrated, and that his cows then started to reject it; that his milk production and earnings per cow then "went down"; and that the "drop in production" lasted from the first or middle part of January until "about half-way in March." He said that during February and March the cows ate about five or six tons of feed less each month because he "couldn't get it into those cows" and that his earnings per cow went down by about $5 per month.

A veterinarian testified that the grain appeared to have "excess moisture" and to be "damp." He also testified that "fines" can affect the palatability of the feed; that palatability of feed can cause a cow to "back off" from it and that "this, in turn, could affect production"; that if the cows were not getting enough to eat, "the first thing that will go will be production" by the "high producing cows"; and that plaintiff "did have milk production loss."

In addition, plaintiff testified that he discussed with Mr. Larkins his dairy program and problems and relied upon Mr. Larkins' advice as a "feed nutritionist" to be sure that he was "feeding right"; that he complained to Mr. Larkins in late January that the feed smelled bad and that the cows were not eating it; that in response Mr. Larkins told him that "for some reason they had changed the mix in the mill"; and that the next load of feed, as delivered by defendant in February, did not smell bad, but "it was still fines."

Mr. Larkins testified that he had been a "nutrition-technical serviceman"; that part of his job was to help a dairyman solve his problems; and that he discussed plaintiff's feeding problems with him. Defendant's owner also testifed that many farmers leave to defendant decisions relating to their "food plans."

ORS 72.3140(2)(c), relating to implied warranties of merchantability, provides that goods to be merchantable must be such as "are fit for the ordinary purposes for which such goods are used."

■■ In our judgment, there was substantial evidence from which the court, as the finder of the facts, could properly find that the dairy feed furnished by defendant to plaintiff in January and February 1972 was not "fit for the ordinary purposes for which such goods are used," within the meaning of ORS 72.3140 (2) (c).[4]

*3. Plaintiff's claims of damage.*

At the time of trial defendant did not move to withdraw any of the various items of damages alleged in plaintiff's complaint, but contends on appeal, by separate assignments of error, that there is no substantial evidence to support any of them. Based upon such a record, and because the trial court made only a general finding of damages in favor of plaintiff in the sum of $8,338.78, such separate assignments of error may not have been proper.

■■ No such objection was made, however, and even in the event of defective assignments of error, we may consider the sufficiency of the evidence to support a judgment. In addition, defendant could have contended, by a proper assignment of error, that the general finding of damages in that amount was not

---

[4] The fact that plaintiff accepted further deliveries of feed, while relevant to the question of his liability to pay for such feed, as discussed below, did not bar plaintiff's claim for damages for breach of warranty.

supported by substantial evidence. Under those circumstances we will consider the sufficiency of the evidence to support the various alleged items of damage both individually and as a whole. Cf. *Elvalsons v. Industrial Covers, Inc.*, 99 Adv Sh 1077, 1080, 269 Or 441, 525 P2d 105 (1974).

### a. Loss from replacement of five cows.

Plaintiff claimed, as one item of damage, the sum of $1,028.78, for the replacement of five cows which he said had "dried up" prematurely as the result of the defective feed. That sum represents the difference in the proceeds of the sale of these five cows and the cost of the purchase of five replacement heifers.

In support of the contention that there is no evidence to support this item of damage defendant says that plaintiff's testimony was "nothing more than a belief on his part that the feed was a cause" and that "the mere assertion of the layman's belief" was not sufficient as evidence to support that claim.

In *Western Feed Co. v. Heidloff*, 230 Or 324, 334, 370 P2d 612 (1962), a case involving somewhat similar facts, we said that:

"* * * It is generally held that an experienced layman who has observed sickness in livestock following consumption of a particular feed or other substance may testify that the feed was its cause. The authorities are collected and discussed in an annotation, 'Admissibility of opinion evidence of lay witnesses as to diseases and physical condition of animals,' 49 ALR2d 932, 973. We believe that the defendant's testimony, at least when supplemented by that of Dr. Smith, was sufficient to establish a prima facie case that the feed, rather than some other agent, was responsible for the condition of defendant's pigs. * * *"

In this case plaintiff testified that he had 18 years of experience as a dairy farmer and that:

"* * * [R]ight after the first of the year when the cows really started to reject the grain with the fines in it my cows went down on milk and went off feed and I started to get a lot of cows with upset rumen, stomach trouble they call it, dried up and wouldn't produce any more, * * *."

and that:

"* * * [S]ome of my better cows went quite down in production too at that time. They dried up. * * *

"* * * * *

"* * * [T]he five cows I decided that were completely dry, I couldn't get them back to production, * * *."

In addition, plaintiff's veterinarian testified that:

"* * * [I]f through a set of circumstances the cow is not receiving adequate intakes of nutrients the first thing that will go will be production. This will be the first sign you will see, will be loss of production. Secondly will probably be conception rate and thirdly loss in body weight because a cow, like I say, will maintain life before they will maintain extras such as reproduction and lactation. I think this is basic. * * *"

■ This testimony, together with testimony previously reviewed, was sufficient, in our opinion, to support a finding by the trier of the facts that feed delivered by defendant in January and February was unpalatable and was "rejected" by these cows and that, as a result, their production of milk "went down" to the point that they "dried up" prematurely.

Defendant also contends that the difference in the replacement cost is not appropriate as a measure of damages because plaintiff replaced four- or five-

year-old cows with more valuable two-year-old cows ("springer heifers").

■ Plaintiff testified, however, that "the highest producers got hit" and that these were more valuable to him as the owner of a dairy farm than the younger heifers purchased to replace them, which did not produce as much milk. Defendant offered no evidence to the contrary. On this record, and in the absence of any objection at the time of trial to the admissibility or sufficiency of such evidence, we hold that the difference between the proceeds of the five dry cows, which were sold to the butcher for beef, and the cost of the five replacement heifers was an appropriate measure for this item of damage. It follows that there was substantial evidence to support a finding in favor of plaintiff on this item of damage.

### b. Cost of medicines.

Plaintiff claims as a further item of damage the sum of $250 for medicines and nutrients. Defendant also says that there was insufficient evidence to support this claim.

■ Plaintiff testified that when the cows started to reject the feed and "dried up" "we had to do a lot of ruminating * * * feed them with bacterial pills and all that to get the rumen started again so they would produce milk again" and that he used "about $250 worth of drugs over that period of time * * * the anti-biotics, rumen pills, rumen stimulators." That testimony was received without objection and there was no motion on trial to withdraw that item of damage. On this record we hold that there was substantial evidence to support a finding in favor of plaintiff on this item of damage.

### c. Loss of milk dumped for "high leucocyte count."

■ Plaintiff also claimed as an item of damages the

sum of $480 for the loss of 8,000 pounds of milk dumped because of a "high leucocyte count," so as to make it unmarketable. Defendant contends that there was no substantial evidence to support a recovery of such an item of damages. We agree.

The only evidence to support such recovery was the testimony of plaintiff's veterinarian to the effect that dietary deficiency "could" cause a high leucocyte count (leucocytes are the remains of white blood cells). He also testified, however, that it would be "very hard to answer 'yes' or 'no'" to this question as a "medical probability" and that mastitis, an infection, can also be the cause of such a problem.

### d. Purchase of 17 "replacement" heifers.

Plaintiff's complaint also alleges, as an item of damages, that he "had to purchase 17 replacement heifers at a cost of $4,850." Defendant contends that there is no substantial evidence to support this claim. We agree.

■ Assuming, as plaintiff contends, that because of faulty feed some of his cows did not become pregnant when expected to do so, they did become pregnant two or three months later and were retained in his herd. As a result, plaintiff was not entitled to charge the entire cost of the 17 replacement heifers. He also gave no satisfactory explanation of the basis for any deduction which might have been allowed by him in arriving at his claim of an alleged net loss of $4,850.

### e. Value of feed delivered.

Finally, plaintiff's complaint alleges as an item of special damages, the sum of $4,400 paid to defendant for bad feed." Plaintiff relies upon testimony that the feed delivered in January and February had a protein content of 11 per cent and that the difference between the value of such feed and feed with a protein

content of 16 per cent was from $3.50 to $4 per ton for each per cent of protein content.

As previously held, defendant made no express warranty that the feed would have a protein content of 16 per cent and the only basis for recovery by plaintiff is for breach of implied warranty of merchantability based upon evidence that the feed delivered in January and February had a bad odor and contained "fines."

■ Plaintiff, however, not only accepted deliveries of such feed, but fed it to his cattle for two months. In addition, plaintiff does not contend in his brief that such feed had no value, but only that it was worth less than feed with 16 per cent protein content. Neither did plaintiff offer any evidence from which the trier of the facts could determine how much its value may have been impaired by reason of the bad odor and "fines," as compared with the price paid for such feed, or how much it would have cost to supplement such feed so as to provide the cattle with an adequate protein intake. Cf. *Western Feed Co. v. Heidloff,* 230 Or 324, 335-337, 370 P2d 612 (1962). In the absence of such evidence, however, there was no substantial evidence to support a finding in favor of plaintiff on this item of damages.

*f. The judgment for damages in the sum of $8,338.78 was not supported by the evidence.*

After excluding from consideration the items of damages claimed by plaintiff which were not supported by substantial evidence (the claims of $4,850 for the 17 replacement heifers; $4,400 for "bad feed" and $480 for dumped milk), and after limiting the amount which plaintiff was entitled to claim to the items supported by some substantial evidence ($1,028.78 for loss from replacement of five cows ' and $250 for medicines and nutrients), it appears that the judgment of

the trial court for $8,338 was not supported by substantial evidence. Because we cannot determine from the record how that amount was arrived at by the trial court, it follows that the judgment must not only be reversed, but the case remanded for a new trial.

4. *Defendant's counterclaim.*

Finally, defendant assigns as error the denial of, or failure to rule upon, its counterclaim for $1,599.63, representing the price payable for two deliveries of feed in February 1972. In response, plaintiff says that because the difference between the amount claimed by plaintiff and the amount of the judgment awarded by the court, the sum of $8,338.78, was greater than the amount of the counterclaim, it cannot be said that the trial court denied or failed to rule upon that counterclaim.

Because, however, it does not clearly appear from the record whether the trial court allowed or denied defendant's counterclaim and because this case must be remanded for a new trial on plaintiff's complaint, we hold that the case should also be remanded for a new trial on that counterclaim.[6]

Reversed and remanded.

---

[6] For the purpose of the new trial, attention is called to ORS 72.6070, which provides that "[t]he buyer must pay at the contract price for any goods accepted." This is not to say, of course, that one who accepts delivery of goods is not entitled to recover for damages resulting from defects in such goods.