Argued October 29, 1975, affirmed January 15, 1976

# ADAMSON et al, *Respondents,*
*v.*
# WEST VALLEY ASSOCIATES, INC., *Appellant.*

544 P2d 578

*Joseph F. Ceniceros,* Portland, argued the cause for appellant. With him on the brief were Bailey, Doblie and Bruun, Portland.

*Ralph W. Bolliger,* Beaverton, argued the cause for respondents. With him on the brief were Myatt, Bolliger, Hampton & Tarlow, P.C., Portland.

BRYSON, J.

**BRYSON, J.**

Plaintiffs brought this action for breach of contract. Trial was held before the court, without a jury, and judgment was entered for plaintiffs. Defendant appeals.

On October 7, 1969, plaintiffs entered into a written agreement with the owners of the Oaklake Apartments wherein plaintiffs were granted "the exclusive rights to install, operate and maintain a coin-operated laundry" on the premises. The agreement was for a four-year period ending July 31, 1973, with automatic renewal on an annual basis unless notice to terminate was given 90 days prior to July 31, 1973, or the end of each renewed term. The agreement also states, "This agreement runs with the land and is binding upon First Party, its heirs and assigns." Plaintiffs agreed to pay the apartment owners $1,500 plus 40 percent of their gross receipts from the laundry equipment.

The agreement further provided:

> "In the event that First Party [the owners] shall sell the apartment building and premises while this agreement is in full force and effect, First Party agrees that this contract shall be sold and/or transferred to the buyer thereof, and all of the terms and provisions hereof shall remain in full force and effect, and said buyer shall acknowledge in writing to both of the parties hereto its assumption of an agreement to perform all of the provisions of this contract and the terms hereof."

This agreement was recorded in the deed records.

In July of 1970 Jack Fuls and his wife acquired the complete ownership interest of the Oaklake Apartments. On February 8, 1973, the Fuls and plaintiffs executed a "three (3) year extension (the new expiration date shall be the 31st day of July 1976)" of the 1969 agreement. Plaintiffs paid the Fuls $1,000 for this extension. This three-year extension, which was not recorded, was to be governed by the terms of the 1969 agreement.

Approximately 10 months after the extension had been granted, Mr. and Mrs. Fuls met defendant's president, Bertil Granberg, and commenced negotiations for the sale of the Oaklake Apartments to defendant. On February 4, 1974, the parties executed a Contract of Purchase and Sale which provided in part:

"5. TITLE INSURANCE. Promptly following closing of this transaction, Seller [the Fuls] shall provide Buyer [defendant] with a policy of title insurance insuring Buyer * * * that Buyer is the holder of a marketable fee simple title to the subject property, subject only to the encumbrances referred to in Title Insurance Company's Preliminary Title Report No. 324825.[1]

"* * * * *.

"8. POSSESSION. Buyer shall be entitled to possession of the premises on the date of closing, subject, however, to the existing leases and month to month tenancies, *and subject to the existing agreement covering the laundry concession at the premises, which agreement shall be honored by Buyer. * * *"* (Emphasis supplied.)

Twenty-three days after the sale defendant wrote plaintiffs advising: "* * * Any right you may have to operate laundry facilities at Timber Creek Apartments under purported agreement dated June 8, 1973 and at Oaklake Apartments under purported agreement dated October 7, 1969 is hereby terminated. You are required to remove your equipment. * * *" A month later defendant again informed plaintiffs that the contract was terminated.[2] Thereafter, on or about March 30, 1974, defendant replaced plaintiffs' equipment and services with that of Coin-Meter Company,

---

[1]Since the 1969 agreement had been recorded, the title report showed that title to the Oaklake Apartments was subject to plaintiffs' "interest" under that 1969 agreement.

[2]In this latter notice defendant wrote: "Kindly accept this letter as notice in the alternative that said Oaklake contract is in any event terminated July 31, 1974 if said contract is indeed a binding contract between yourself and Oaklake Apartments."

plaintiffs' competitor.[3] Plaintiffs commenced this action on May 19, 1974.

The trial court found:

"(1) Bertil Granberg, the president of the defendant, had actual knowledge of the contract extension agreement (Exhibit 2).

"(2) Bertil Granberg on behalf of West Valley Associates assumed the extention [sic] agreement (Exhibit 2) when he signed the contract of sale for the Oaklake Apartments (Exhibit 5, paragraph 8).

"(3) The defendant corporation through its president Bertil Granberg breached the contract (Exhibits 1 and 2) by evicting plaintiffs and contracting with Coin Meter Company.

"(4) Plaintiffs performed all parts of the contract on their part to be performed.

"* * * * *."

Defendant first assigns as error the trial court's finding that defendant, through its president, knew that the Fuls had extended plaintiffs' privileges to July 31, 1976. In considering this assignment, we are concerned only with the sufficiency of the evidence to support the trial court's findings. *Jorritsma v. Farmers' Feed & Supply,* 272 Or 499, 538 P2d 61 (1975); *Lokan v. Roberts,* 270 Or 349, 527 P2d 720 (1974). We view the evidence in a light most favorable to the plaintiffs.

Mr. Fuls testified that prior to the sale of the Oaklake Apartments he told defendant's president that plaintiffs' agreement had been extended to July 31, 1976. Mr. Fuls testified:

"THE COURT: Told who?

"THE WITNESS: Mr. Granberg [defendant's president], about the laundry contract, the extension that we had signed for another three years.

---

[3] On the day that it purchased the Oaklake Apartments, defendant also executed an agreement with Coin-Meter Company. Under this agreement, Coin-Meter Company was to replace plaintiffs' services and equipment as of April 1, 1974. On the same day, Coin-Meter Company "loaned" defendant $15,000.

"Q And what did you tell him about the contract, or what did he ask you?

"A He asked if we had a contract on the laundry equipment at the time that he was proposing to buy.

"These are some of the questions that he asked. And we told him yes, we had just signed a new agreement for an extension of three years with the same people because we were happy with their service."

Defendant, in his deposition received in evidence, disclaimed knowledge of "any other agreement [other than the 1969 recorded document]."

■ The evidence, though conflicting, is sufficient to support the trial court's findings which has the effect of a jury's verdict. *Fabre v. Halvorson,* 250 Or 238, 239, 441 P2d 640 (1968); *Mission Ins. Co. v. Enger Ins. Co.,* 266 Or 439, 444, 513 P2d 763 (1973). There was no error in this respect.

■ Defendant next contends that the trial court erred "in denying defendant's Motion to Strike plaintiff's [sic] Amended Complaint Paragraph VI and for Involuntary Non-Suit." The record shows that both motions were made at the close of plaintiffs' case and were addressed to the same issue; that is, whether there is any competent evidence to support plaintiffs' allegations that defendant "purchased the Oaklake Apartments and acknowledged in writing is assumption of said agreement."

In *Karoblis v. Liebert,* 263 Or 64, 75, 501 P2d 315 (1972), we held that

"* * * [a] defendant in a law action tried to the court without a jury may not test the legal sufficiency of plaintiff's evidence at the close of plaintiff's case. If he wishes to challenge the sufficiency of the evidence he must rest his case and submit the matter to the court on its merits."

*Accord, Petersen v. Thompson,* 264 Or 516, 523, 506 P2d 697 (1973). *See also United Pac. Ins. v. Mazama Timber,* 270 Or 242, 527 P2d 259 (1974).

In the instant case, defendant did not rest its case, but proceeded to put on its case-in-chief. It is quite clear from our decision in *Karoblis v. Liebert, supra* at 74-75, that defendant could not avail itself of a motion for nonsuit or other device which tests the sufficiency of plaintiffs' proof when plaintiffs rested. Thus, defendant's second assignment of error presents no issue for consideration on appeal.

In 1975 the legislature amended ORS 18.230 and changed the procedure established by *Karoblis.* Under Oregon Laws 1975, ch 134 (effective September 13, 1975), a defendant in a nonjury trial may move for and obtain a judgment of nonsuit under ORS 18.230. If defendant's motion for nonsuit is denied, he may proceed to put on evidence in support of his case-in-chief.

Nonetheless, the 1975 amendments to ORS 18.230 did not take effect until September 13, 1975, several months after the instant case had been tried and after judgment had been entered on the merits. We can find nothing to indicate that the legislature intended Oregon Laws 1975, ch 134, to be given retroactive effect. Retroactive application of the amendments to ORS 18.230 in the instant case would impose a new trial procedure after the parties had already tried their cause under the then existing law. *See State ex rel Town Concrete v. Andersen,* 264 Or 565, 568, 505 P2d 1162 (1973); *Joseph v. Lowery,* 261 Or 545, 547-49, 495 P2d 273 (1972). See also 2 Sutherland, Statutory Construction § 41.04 nn.16-17, at 253-54, § 41.09 nn. 16-19, at 281 (Sands, 4th ed 1973).

Lastly defendant contends that the trial court erred in finding that defendant "violated" its contract when it evicted plaintiffs from the Oaklake Apartments before July 31, 1976, and contracted with Coin-Meter. Defendant contends that "the extension agreement is a license, pure and simple, terminable at will." We first point out that this issue was not raised before the trial court.

In the instant case the trial court found that de-

fendant had actual knowledge of and assumed the *contractual* obligations of the sellers, Fuls. *See Daniels v. Parker et al,* 209 Or 419, 422-23, 306 P2d 735 (1957). Even if we assume that plaintiffs held nothing more than a license,

> "* * * its revocation may constitute a breach of contract. * * * [W]here a license is given for a definite period of time revocation gives rise to damages for breach." 1A Thompson, The Modern Law of Real Property § 225 at 234-35 (1964 Repl).

*See also Case v. Kadota Fig Ass'n of Producers,* 207 P2d 86, 96 (Cal App 1949), *modified,* 35 Cal 2d 596, 220 P2d 912 (1950).

In a case involving the installation of laundry machines under similar facts, including similar written instruments, the court held:

> "The original agreement was made for the benefit of plaintiffs herein and contained the provision that subsequent purchasers of the premises were to be likewise bound thereby. Defendant accepted and ratified this agreement by agreeing, in its contract to purchase the premises, to assume performance thereof from and after the closing. Although the original agreement may not have created any rights in the property which would run with the land it did create a valid agreement for a license for a definite period and a revocation thereof would give rise to a cause of action for breach of contract. [Citations omitted.] * * *" *Bermann v. Windale Properties,* 10 Misc 2d 388, 169 NYS2d 975, 977 (1957).

In its brief, defendant concedes that the Fuls may have lacked the authority to revoke the agreement at will. Defendant had no greater rights than its predecessors. We find no error in this respect.

Affirmed.